(Decided February 15th, 1878.)

WM. H. MOORE & CO. *vs.* THE STATE OF MARYLAND.

BAILMENT.

*Inspection of tobacco by authority of the State—Power of the State to require and to regulate such inspection by law—Delivery of tobacco into the custody of the State for inspection does not make State responsible for its safe-keeping—Such delivery does not establish the relation of bailor and bailee, so far as any contract is concerned.*

Suit was brought by W. H. M. & Co. against the State of Maryland, under the Act of 1876, ch. 370, to recover the value of tobacco belonging to W. H. M. & Co. which had been stored in the State Tobacco Warehouses for inspection, and which was destroyed by fire, January 7, 1875. The plaintiffs alleged that the loss occurred by reason of the negligence of the State. The defendant demurred to the declaration. It was HELD:

1st. From the origin of the government of the State, laws have been passed for the inspection of tobacco, with a view, amongst other objects, of raising revenue for public use, and the tobacco was required to be brought to the warehouses of the State for that purpose.

2nd. The State, in the organization of the Federal Government, having reserved the power of passing inspection laws, has since enacted such regulations as it deemed judicious and necessary for that purpose.

3rd. In the enactment of laws regulating the inspection of tobacco, the State only exercised its authority as a sovereign power to require such inspection for such purposes as in its wisdom and discretion and upon public considerations, it deemed just and proper.

4th. In doing so, the State in no sense became a bailee of tobacco, nor made itself responsible as a warehouseman in the legal acceptation of that term.

5th. Such control constituted no element of contract or obligation on the part of the State to become answerable for the safe-keeping of the tobacco.

APPEAL from the Circuit Court for Anne Arundel County.

In accordance with the requirements of the inspection laws of the State of Maryland, certain owners of tobacco stored their tobacco in the State Tobacco Warehouses, Nos. 1 and 2, situated in the City of Baltimore. The warehouses and the tobacco therein stored were totally destroyed by fire, January 7th, 1875, and the owners claimed that the State of Maryland was responsible to them for the loss of such tobacco.

The General Assembly, in order to determine whether the State was liable to the said owners for the value of the tobacco thus destroyed, and to afford them an opportunity, if it was liable, to ascertain the amount of their actual loss, passed the Act of 1876, ch. 370.

The plaintiffs, proceeding under this Act, brought suit in the forum designated by the Act, to recover the amount of such loss.

The declaration contained two counts.

In the first count, they alleged that the State, on the said January 7th, 1875, and prior thereto, "was the owner of certain warehouses in the City of Baltimore, used and kept for the storage, safe-keeping and inspection of tobacco, brought in hogsheads to the City of Baltimore, for sale; and having and keeping said warehouses for the purpose aforesaid" * * * "received from the plaintiffs * * * into said warehouses, for inspection, storage and safe-keeping, a large quantity of tobacco of the

plaintiffs, of great value, packed in hogsheads, and intended for sale, and to be carried out of Maryland ; and then and there *undertook and agreed with the plaintiffs to inspect and safely to keep and store said tobacco, until the same should be demanded of it  *  *  *  by the plaintiffs, and to deliver the same to the plaintiffs on demand ; but notwithstanding the said undertaking and agreement, and while said tobacco was stored, as aforesaid, in said warehouses, and was in the possession of the State of Maryland,  *  * the said State of Maryland allowed the said tobacco to be, and the same was, totally destroyed by fire."*

In the second count, the plaintiffs set forth the same case, with the single difference, that instead of the allegation that the " State of Maryland *allowed* the said tobacco to be, and the same was, totally destroyed by fire," the second count contained the averment, that "the said tobacco, *in consequence of the negligence and want of proper care and attention of the said State of Maryland, was totally destroyed by fire."*

The State of Maryland entered a general demurrer to the declaration, which was sustained by the Court below, and judgment being given for the defendant on the demurrer, the plaintiffs appealed.

The cause was argued before BARTOL, C. J., BOWIE, ALVEY, ROBINSON and STEWART, J.

*Bernard Carter, John P. Poe* and *Frank H. Stockett,* for appellants.

The question for decision here is, does either count in the plaintiffs' declaration set forth a good cause of action?

We shall confine our discussion to the second count in the declaration, because, if this count is good, the judgment must be reversed.

This count alleges in substance—

1st. That the State of Maryland owned warehouses in the State of Maryland, which it used and kept for the storage, safe-keeping and inspection of tobacco.

2nd. That the State received into said warehouses the tobacco of the plaintiffs for inspection, storage and safe-keeping, and undertook with the plaintiffs to inspect and safely keep and store said tobacco, until the same should be demanded by the plaintiffs.

3rd. That while so stored under said undertaking, and in its possession under said contract, it was totally destroyed by fire, in consequence of *the negligence and want of proper care and attention of the State of Maryland.*

The count therefore treats the State of Maryland as an ordinary warehouseman, and charges that, after making a contract of storage and to safely keep the tobacco, the latter was lost in consequence of the " *negligence and want of proper care and attention on the part of the warehouseman.*"

1. Treating the status of the State in regard to its warehouses, and the obligations it assumes to persons placing goods on storage in said warehouses, as the same as that of any private warehouseman, it is clear this count of the declaration sets forth a good cause of action.

2. A warehouseman is bound to exercise ordinary care and diligence in the keeping of the goods entrusted to him, and is responsible if the loss occurs by his negligence. *Balt. & O. R. R. Co. vs. Schumacker*, 29 *Md.*, 168; *McCarty vs New York and Erie R. R.*, 30 *Penn. State*, 247; *Wharton on Negligence*, 569, 573, 576; *Story on Bailments*, 444.

3. The State of Maryland therefore, in order to sustain her demurrer, must show that for some reason her liability as warehouseman is different from that of ordinary warehousemen. Is such the case? We respectfully submit it is not.

4. In considering this question we are to remember that a sovereign State may make a contract, or come under obli-

gations by reason of having assumed to discharge certain duties, as well as an individual.

It is true, the State cannot be sued for the non-performance of its contracts nor for the failure to discharge its obligations, but this is not because it does not in justice owe the money, but because it is assumed that the State can do no wrong, and that she is ready at all times to remedy and redress of her own accord and voluntarily the wrongs of her citizens.

5. Though ordinarily in determining a demurrer to a declaration, the Court will look only to the language of the same to see if a good cause of action is stated, and though undoubtedly considering the language of the second count of the present declaration, in connection with the settled law above quoted, relating to the obligations of warehousemen, the declaration *does* state a good cause of action against the State of Maryland, we shall, for the purpose of this argument concede, that the Court will consider the laws of the State of Maryland, in reference to tobacco warehouses, in determining the question raised by the demurrer, in order to see whether there is anything in those laws to show that the State of Maryland, as owner of said warehouses, and receiver *into* them of the said tobacco for inspection and storage, instead of incurring the ordinary obligations and responsibilities of a warehouseman, incurs *none at all;* because, unless this latter proposition can be maintained, the demurrer certainly cannot be sustained.

6. Our proposition is, *that the State having become a warehouseman of the tobacco, assumes the ordinary obligations of warehousemen.*

" Whenever a State becomes a *partner* in any trading concern," (and *a fortiori*, when the whole concern or business belongs to her,) " she divests herself, so far as concerns the transactions in which she so engages, of her sovereign character and takes that of a private citizen.

Instead of communicating to the company or its business her privileges, she descends to a level with them with whom she associates, and to the business which is to be transacted." *Bank of United States vs. Planters' Bank,* 9 *Wheat.,* 907.

This is the language of Chief Justice MARSHALL, speaking for the Supreme Court of the United States. See also 11 *Peters,* 324.

And in England the same doctrine prevails. *Duke of Brunswick vs. King of Hanover,* 2 *House of Lords Cases,* 24; *Same Case,* 6 *Beav.,* 5–7; *Gladstone vs. Musurus,* 9 *Jurist, N. S.,* 76.

Unless, therefore, there is something in the Maryland legislation relating to the tobacco warehouses to show to the contrary, it is plain upon the principle of these cases, that when the State of Maryland enters into the warehouse business, she descends to the level with an ordinary warehouseman, and assumes his liabilities.

To escape this conclusion, there must be found such language in the Maryland legislation relating to the tobacco warehouses as manifests such a clear *determination* and *intention* not to assume *any obligation* as warehouseman to the owners of the tobacco there stored, as that the law will imply that such absence of liability must have been well understood by such owners.

7. We submit there are no such provisions; but on the contrary, provisions which should hold the State to a greater measure of liability than that to which ordinary warehousemen are held.

These provisions will be found in Supplement, 1861 to 1867, Article 4, Title "City of Baltimore," pages 427 to 443, and Act of 1872, chapter 36.

*First.* By these provisions (Article 4, section 535, Supplement, 1861 to 1867, p. 439,) *no tobacco* raised in Maryland can be exported unless taken to the warehouses, and there inspected, passed and marked, as required by law.

By section 503, (same Article,) and section 10, Act of 1872, chapter 36, all tobacco delivered for inspection at said warehouses is directed to be taken into said warehouses and receipted for.

It will be thus seen that the delivery into said warehouses is not *voluntary*, but compulsory, as a preliminary to a sale out of the State; and is well known, all Maryland tobacco goes abroad.

*Second.* The State charges for storage, outage and all incidental expenses, such as cooperage, &c., (Article 4, Supplement, sections 520, 521,) and sells scraps, &c., and receives the proceeds, (same section 522;) and sells the tobacco for her charges, if not paid. (Sections 523, 524.)

The entire provisions are those of a regular warehouseman.

8. Does it not inevitably follow, therefore, that the State is responsible for *negligence*, it having been shown that there is nothing in the statutes creating the tobacco warehouse system to negative this liability?

9. It was argued below that the responsibility as warehouseman at all events ceased, if it ever existed, upon the inspection of the tobacco. Even supposing this were so, this would not help the demurrer.

The Court cannot assume that a reasonable time for removal had elapsed since the tobacco was inspected, when the fire occurred.

But there is nothing in the law or the statutes to support any such proposition as is suggested.

The statute allows the tobacco to remain on storage as long as the party pleases, not exceeding four years, however, if the owner is *unknown* to the inspector; and not only allows it to remain on storage, but charges so much a month for the same.

Authorities need not be cited to show that a warehouseman's responsibility lasts till he delivers the goods, or at least gives notice to the bailor to remove them.

10. We may state, by way of illustration, that this fire occurred in the night time.

Now, suppose we are able to show that there was no watchman in charge of the warehouses, this would be evidence to go to the jury of negligence. *Wharton on Negligence*, 569.

No provision is made in the legislation of the State relating to the tobacco warehouses for employment of watchmen.

Section 5 of Act of 1872, chapter 36, which names the assistants the inspector shall appoint, makes no provision for watchmen; they cannot be embraced under the head of "laborers." This is apparent from section 9, which fixes the hours of labor from seven A. M. to six P. M.

Here, then, we have a defect in the very organization by the principal of its warehouse; for this the State, not the subordinates of the State, is responsible.

It is stronger, then, than the case of *Marriott vs. The City of Baltimore*, 9 *Maryland*, 175.

11. But the State of Maryland having embarked in the warehouse business, and compelled the owners of tobacco to place their tobacco there, she stands, and all those who stored their tobacco there had a right to consider her as standing, in the position of every other warehouseman. *United States Bank vs. Planters' Bank*, 9 *Wheat*, 907.

That the tobacco owners had a right to consider that the State intended to hold herself responsible, is shown by the passage of the Resolution of 1842, No. 28, whereby the State assumed to pay for tobacco destroyed by flood.

There is in the treasury a tobacco fund, the result of payments made for storage and outage on tobacco stored in these warehouses, and for proceeds of sale of scraps, &c.

There is eminent propriety, therefore, in the State making good, loss which has occurred by negligence of herself or those she has placed in charge.

Moore & Co. *vs.* State of Maryland.

And in Virginia, where the inspection system was similar to our own, similar responsibility was acknowledged by payment. *Acts of Virginia, May Session,* 1782, *ch.* 10.

And so when Congress (*Laws of United States, Volume 4, page* 381,) *authorized* a deposit of teas in certain cases, it deemed it necessary expressly to provide that they should be at the risk of the importer, to prevent the United States from being liable, though the deposit was voluntary.

It cannot in reply, be justly said that the legislation of Maryland and Virginia above referred to was a *voluntary* payment, and made *ex gratia.* In one sense it was so, that is because the State could not be compelled by *suit* to pay; but it was at same time a recognition of the *right* of the owners to *have* payment.

This is all we ask now, as the Act of 1876, chapter 370, has removed all other difficulties.

12. This Act of 1876, chapter 370, is a plain recognition of our right to *recover,* if we can show that at *law or equity* we have a just claim.

And the exclusion of insurance companies shows that the Legislature recognized that there might be insurance on the property as an additional protection, and yet that the State might be responsible.

No apprehension of inconvenient consequences from a decision in our favor need exist, as the State need never allow herself to be sued, except when she chooses.

We respectfully submit that the judgment should be reversed, that the plaintiff may have an opportunity of showing that the loss occurred by negligence, for which the State is answerable.

*M. Bannon, H. Aisquith* and *C. J. M. Gwinn,* Attorney-General, for appellee.

1st. In each one of the two counts, to which reference has been made, the plaintiffs make the *gravamen* of their

action to consist of a breach on the part of the State of the duty imposed upon it by the particular contract set forth in said counts, and consider such breach of duty as an act of tortious negligence. *Govett vs. Radnidge*, 3 *East*, 70, *Ellenborough; Weall vs. King*, 12 *East*, m. p. 454, 455; 1 *Chitty on Pleading*, m. p. 134, 135.

In every action thus framed, the *contract* alleged is, of necessity, the foundation of the action. The averments of its existence cannot be rejected as surplusage. *Weall vs. King*, 12 *East*, 454, 455.

The Court must take judicial notice of the Acts of Assembly, upon which the liability of the defendant has arisen, if any such liability exists, although they are not mentioned in the counts, (1 *Chitty on Pleading*, m. p. 218; *Stephen on Pleading*, 284,) to precisely the same extent, as if the portions of these Acts, applicable to the claim made, were referred to or fully set forth in such counts.

Under the demurrer, therefore, the Court ought to determine the following questions:

1. Whether, under the laws of this State, the receiving of the tobacco of the plaintiffs into the State Tobacco Warehouses of the defendant, did constitute any *agreement* on the part of the State with the defendants to inspect and safely keep and store their property, until the same should be demanded by the plaintiffs, and to deliver it to the plaintiffs on demand?

2. If the question just stated is decided against the appellants, and the Court should decide that the said tobacco was not received into the State Tobacco Warehouses under any *contract* with the State, but only in the execution of the inspection laws of this State, then, *ut sit finis litium*, the State will ask the Court to determine that the appellants cannot recover under any form of pleadings for the loss of said tobacco by fire, while it was in any one of said tobacco warehouses.

The Court is aware that the tobacco inspection system of this State originated at a very early period in our colonial history.

It was instituted originally for the purpose of securing revenue to the Lord Proprietor, by imposing a duty on exported tobacco, and for the purpose of maintaining the reputation of tobacco grown in the Province of Maryland, by preventing the exportation of "trashy" or unmerchantable tobacco. The Act of 1671, chapter 11, recited in the Act of 1704, chapter 42, the Act of 1707, chapter 5, and the whole body of the laws relating to "tobacco," set forth in Bacon's Laws, clearly show the double object of the system under the Proprietary Government.

The right of inspection, and the purposes for which the inspection was made, required the establishment of warehouses by the Proprietary Government, to which tobacco should be brought for inspection, and the enactment of laws compelling owners of tobacco, intended for shipment, to bring it to such warehouses.

Provision was made during the Revolutionary War, for the continuance of the inspection system by resolutions of the Convention, on September 6th, 1776, and November 8th, 1776.

The power having been reserved to the States by the Constitution of the United States, Article 1, section 10, sub-clause 2, to make and execute their respective inspection laws, this State regulated the inspection of tobacco and the system of tobacco warehouses, by the Act of November Session, 1789, chapter 26, an Act copied, in many of its essential parts, from the laws in force under the Provisional Government.

The Act of 1864, chapter 346, as amended by the Acts of 1865, chapter 194, 1867, chapter 368, and 1872, chapter 36, constituted the Code of Tobacco Laws in force in this State when the loss occurred, which is the subject-matter of the appellants' declaration.

The power no longer existed to levy an export duty upon tobacco, but the right continued to maintain the reputation of the tobacco grown in the State, by compelling inspection at appointed places, before it was exported, in order to prevent the exportation of unmerchantable tobacco.

The establishment of warehouses to which tobacco should be brought for inspection, and the inspection of such tobacco, were parts of one system of government.

The State might, for convenience, have designated, as was done by the Provincial Assembly, warehouses belonging to individuals, to which such tobacco might be brought; and place them in the care of inspectors nominated by the parish vestries. It might, as was afterwards done, authorize local authorities in the various counties to exercise the power, and to build or lease warehouses for the storage of such tobacco while waiting inspection; or it might build or lease such warehouses as it saw proper for this purpose, and trust them to the keeping of inspectors appointed by the Governor, as is now done.

The State, in pursuing any one of these courses, would be exercising a legitimate power of government, because it would be taking the means best adapted, in its judgment, to secure the inspection of that commodity, which, in its wisdom, it had resolved should be inspected.

The exercise of a power of inspecting a commodity does not imply any contract upon the part of a government that it will safely keep such commodity until such inspection is completed, and then return it in good condition.

The obligation of the citizen to take his tobacco to one of the places appointed for its inspection; and to leave it in the custody of the officer by whom the duty must be performed, is precisely of the same character with the duty imposed by the Federal law upon an importer, to enter his goods in a particular port, and to submit to their

deposit, under certain circumstances, in particular warehouses designated by the Federal law.

The requirement of the Federal law that imported goods should, under certain circumstances, be deposited in the public warehouses, forming a part of our customs system, does not create any contract of bailment between the importer and the United States.

The obligation imposed by the Federal law, that letters shall be transmitted from place to place only by the authorized mails, does not imply a contract of bailment, between the Government and the persons depositing his letters in such authorized mails.

The obligation imposed by law upon every private person in whose possession a will or codicil may be, after the death of the testator, to deliver the same to the Register of Wills of the county, where such paper ought to be proved, does not imply any contract of bailment between the State and the depositor of said paper, or any parties interested in such paper.

Many such examples might be given. It is enough to say that the right of a Government to require the citizen to perform any act, does not involve the implication of any contract on the part of the Government to indemnify such person against the loss which he may incur because of his performance of such duty.

No contract of bailment, and no responsibility on the part of the State, are created by the deposit of tobacco in the State tobacco warehouses.

The importer, the senders of letters, the custodians of wills and the owners of tobacco, enter into no agreement with their respective sovereignties. They must assume personally the risks of that which they do, because they only perform duties, which are imposed upon them respectively by the terms of positive law.

When duties are paid upon the goods so imported, and when such tobacco is inspected, they are not returned to

their respective owners in pursuance of any contract. They have been subjected to the examination which the laws, in each case, require should be made.    They remain, thereafter, subject to the right of their respective owners to remove them upon payment of such charges as may have attached, and upon evidence of a right to the possession of the property.    The receipt, which the inspector in charge of a tobacco warehouse gives for tobacco delivered at such warehouse, (Code, 1861–1867, page 430, section 503; Act of 1872, chapter 36, section 10,) is the evidence of this ownership, so far as the State is concerned, but of nothing more.

The receipt in question is not, however, without other defined uses.    The inspectors give bond for the faithful performance of their duty.    (Code, 1861–1867, page 428, section 496; Act of 1872, chapter 36, section 2.)

They are obliged to take charge of the tobacco delivered at their respective warehouses, and to give receipts for the same, and they are personally responsible upon such receipts.

But it cannot be said, even so far as the inspector is concerned, that his receipts are *contracts*.    They are evidences that the inspector, in performance of his public duty as a State officer, has assumed custody of the tobacco for which he has receipted.    They fix the responsibility of the custody only, and then the law, in case of tort, or default, on his part, gives a remedy to the owner of the tobacco against the inspector—makes this receipt the evidence, and, to some degree, the measure of his responsibility,— and permits the loss suffered to be recovered by a personal action, or by suit upon the bond of the inspector.

Inasmuch as it would seem to appear from the consideration of the statutes, which must be taken by the Court to be referred to in the declaration, and from the argument already made, that no agreement, or contract of any description, had been entered into by the State with these

appellants, though such agreement is averred in the *narr.* the judgment of the Court, on the demurrer, must be sustained, because of the appellants' misconception of their cause of action.

2nd. It cannot be pretended that the State has not made ample provision by law for the custody and care of all tobacco deposited for inspection, under the requirements of law, in the State tobacco warehouses.

If the State had failed, in the judgment of this Court, to make adequate and complete provision by law for such safe-keeping, and it could make such provision in no other manner, it would not, for this reason, be responsible to the appellants. The failure of a State to enact a law for the better security of the citizen, does not give a right of action to the citizen against the State, even if he should suffer loss because of the omission of a State to enact such law.

But, as will be seen by inspection of the laws already referred to, and which must be considered by the Court, complete provision was made by law for the safe custody of the property in the State tobacco warehouses.

The tobacco in question was not in fact, or in law, in the possession of the State. It was in the custody of a bonded officer, duly appointed under the laws of the State to take such custody. If he performed his duty negligently, his negligence cannot be imputed to the State by which he was appointed.

The case of *Schmaltz vs. United States,* 4 *Court of Claims Reps.,* 147, 148, MILLIGAN, J., is decisive of this question. The Court says—"The question now presented is, whether the failure of the United States officers to discharge a plain duty imposed by law upon them, charges the Government itself with the loss consequent upon the default of such officers. And we think it does not. * * * * A general law does not imply a contract with a citizen, which, upon its violation by the agent entrusted with its

execution, he can enforce in damages against the government enacting it. It is a rule of civil action, alike applicable to all, and of necessity must be executed by human agents, who are liable to err, and often, through negligence or misconduct, fail to execute it with fidelity. Neither the law, nor the Government, is responsible for such default, but the agents who fail to execute it. This principle runs through every department of the Government, State and National."

This case only re-affirms a principle clearly settled in the following leading cases: *Dunlop vs. Munroe*, 1 *Cranch C. C. Rep.*, 242–269; *Same Case*, 7 *Cranch S. C. Rep.*, 269; *Spencer vs. U. S.*, 8 *Court of Claims Rep.*, 294; *U. S. vs. Collier*, 3 *Blatchford*, 349; *Bayley vs. Mayor of New York*, 3 *Hill*, 538; *Wiggins vs. Hathaway*, 6 *Barb.*, *N. Y.*, 635; *Whitfield vs. Despenser*, *Cowper*, 964; *U. S. vs. Brodhead*, 3 *Law Rep.*, 96; *Dorsey's Ex. vs. State*, 4 *H. & McH.*, 165; *Wharton on Negligence*, sec. 288, and cases cited in note; *Lane vs. Cotton*, *Ld. Raymond*, 646; *Story on Bailment*, 7th *Ed.*, secs. 461, 463; *Wilson vs. Peverley*, 1 *Am. Lead. Cases*, 4th *Ed.*, page 651.

The plaintiffs, knowing the locality in which their tobacco must be stored, and the risks which would attend it while in the custody of the inspector, (*Knowles vs. Atlantic and St. Lawrence R. R. Co.*, 38 *Maine*, 60; *McCarty vs. New York and Erie R. R. Co.*, 30 *Penn. St.*, 247,) ought, if they desired to be indemnified against loss from *fire*, to have insured their tobacco. *Wharton on Negligence*, sec. 570.

STEWART, J., delivered the opinion of the Court.

Some tobacco belonging to private individuals, stored in the warehouses of the State, where it had been carried in pursuance of the law for inspection, was destroyed by fire.

The owners claim that the State is legally bound to indemnify them for the loss.

Having no power to institute suit against the State, without special leave, the Act of 1876, ch. 370, was passed, authorizing them to bring suit against the State, for the purpose of ascertaining, through the Courts, if the State is liable to them for the value of the tobacco, and if so, the extent of the damages.

This suit was brought in pursuance of the said Act, to recover from the State the damages claimed.

A general demurrer was filed in behalf of the State to the declaration of the plaintiffs making the claim.

The Circuit Court sustained the demurrer, and the plaintiffs have appealed, and the question is—Was any error committed by the Court in so ruling?

From the origin of the government of the State, laws have been passed for the inspection of tobacco.    Amongst other objects, with a view of raising revenue for public use, and the tobacco was required to be brought to the warehouses of the State for that purpose.    Whether these inspection laws have been wise it is not our province to determine.

That power resides in the Legislature.

The State, in the organization of the Federal Government, having reserved the power of passing inspection laws, has since enacted such regulations as it deemed judicious and necessary for that purpose.    In regard to the inspection of tobacco, the Act of 1864, ch. 346, amended by the Acts of 1865, ch. 194, 1867, ch. 348, and 1872, ch. 36, were the Acts in force when the loss and damage, now claimed by the plaintiffs, were sustained.

In the enactment of these laws, the State only exercised its authority as a sovereign power, to require the inspection of tobacco, for such purpose as, in its wisdom and discretion, and upon public considerations, it deemed just and proper.

In doing so, the State in no sense became a bailee of the tobacco, nor made itself responsible as a warehouseman, in the legal acceptation of that term.

Such control constituted no element of contract or obligation, on the part of the State, to become answerable for the safe-keeping of the tobacco.

On behalf of the citizens generally the State was only exercising its lawful attribute of authority, in compelling its production at its warehouse, under the control of the inspector, the public officer appointed for that purpose, and who is required by such laws as the State may enact, to give bond as such for the faithful discharge of his duty.

To him is confided the custody of the tobacco, brought to the warehouse for inspection, until delivered to the owner.

He is responsible, according to the law enacted upon the subject, for his good conduct, as may be required of any other public officer in regard to the discharge of any other official duty. *Schmaltz vs. United States,* 4 *Court of Claims Rep.,* 147 ; *Dorsey's Ex'r vs. State,* 4 *H. & McH.,* 165 ; *Story on Bailment,* 461–463.

*Judgment affirmed.*

(Decided February 20th, 1878.)