**KOPPERS COMPANY, INC. and Paul Wurth, S. A. and Republic Steel Corporation**

v.

**S/S DEFIANCE, her engines, boilers, etc. Farrell Lines, Inc. and John T. Clark and Son of Maryland, Inc.**

**Civ. No. K–80–2416.**

United States District Court, D. Maryland.

July 13, 1982.

David W. Skeen, William A. Skeen and James D. Skeen, Baltimore, Md., for plaintiffs.

Manfred W. Leckszas, Baltimore, Md., for defendants S/S DEFIANCE, her engines, boilers, etc. and Farrell Lines.

R. Roger Drechsler, J. Paul Mullen and H. John Bremmerman, III, Baltimore, Md., for defendants S/S DEFIANCE, her engines, boilers, etc., Farrell Lines, Inc. and John T. Clark and Sons of Maryland, Inc.

FRANK A. KAUFMAN, Chief Judge.

The facts of the within case are not in dispute[1] and may be summarized as follows: Plaintiff Republic Steel Corporation (Republic) purchased from plaintiff Paul Wurth, S. A. (Wurth) certain spare parts for a blast furnace. Wurth undertook to ship the same from Bremerhaven, West Germany, aboard the S/S DEFIANCE, a vessel owned and operated by defendant Farrell Lines, Inc. (Farrell) to Baltimore, Maryland, where they were to be delivered to the consignee, plaintiff Koppers Company, Inc. (Koppers). From Baltimore, the parts were to be shipped by Koppers by truck to Republic's plant in Ohio.

The parts were packaged in four separate crates, three of which were shipped in one container. The fourth crate, containing a Warren Bell Less Top Blast Furnace, was attached with wires and turnbuckles to a "flat rack" container. Each of the two containers was owned by Farrell. The cargo was loaded on board the DEFIANCE at Bremerhaven in August 1979, and arrived in Baltimore without incident. On September 10, 1979, the cargo was discharged from the DEFIANCE at the Dundalk Marine Terminal in the Baltimore area by John T. Clark and Sons of Maryland, Inc. (Clark), a stevedoring firm which performed services under a contract between it and Farrell. The "flat rack" container, along with its attached cargo, was lifted by crane out of the hold of the vessel and placed upon a chassis owned by Farrell. That chassis, with the "flat rack" container, was then hauled by one or more Clark employees to a container yard within the terminal some 300 yards from the point of discharge, where the said chassis and container remained overnight. The other container containing the three crates also was taken to the container yard by one or more Clark employees. It apparently arrived without any problem at Republic's plant in Ohio.

On September 11, 1979, Joseph Letts, an employee of Clark, was instructed by his foreman to bring the chassis with the "flat rack" container from the container yard to Shed No. 4, Dundalk Marine Terminal. A portion of Shed No. 4 was leased by Farrell from the Maryland Port Administration, was operated by Clark and was used by Clark for cargo storage and for the preparation of cargo for inland shipment. While Letts was hauling the chassis bearing the "flat rack" container out of the container yard, the chassis tipped over, damaging the cargo in that container. It is with regard to that damage that plaintiffs' claim herein against the three defendants. Had the accident not occurred, the "flat rack" container would have been transported to Shed No. 4, and the crate with the furnace part would have been removed from it and loaded for transport to Warren, Ohio, on a trailer owned or operated by George's Transfer Co., a trucker selected by John S. Connor, Inc. (Connor), the customs broker retained by Koppers both to obtain customs clearance for the cargo and to make arrangements for the overland shipment from Koppers to Republic. After the accident, the contents of the "flat rack" container were not handled by Clark, but were instead recrated by another stevedoring firm for shipment to Republic in Ohio.

On the face of the bill of lading there was stamped the designation "Pier to Pier Traffic." That designation requires handling of the cargo by the carrier before its loading on and after its discharge from the vessel, and differs from the designation "House to House Traffic" on a bill of lading. The latter calls for the shipper to pack the container at the shipper's own facility and to deliver the packed container to the carrier at the port of departure for further loading aboard a vessel and shipment to the port of destination. At such port, the container, shipped as "House to House Traffic," is unloaded from the vessel and taken to a container yard, from which it is picked up

---

1. The question of whether defendant John T. Clark and Son of Maryland, Inc. was acting as a stevedore or as a terminal operator, when the accident involved herein took place, may present a factual dispute. But the resolution of such factual dispute, if any, is not required for the reasons discussed *infra*.

by an outside trucking company for hauling to the ultimate consignee. By way of contrast, under the "Pier to Pier" designation, the cargo itself is delivered to the carrier at the port of departure, where it is put into a container, loaded onto a vessel and shipped to its port of destination. On arrival at such port, the container is unloaded from the vessel and taken to the container yard, and from the container yard is taken to a facility within the terminal (such as Shed No. 4) to be "stripped." The process of stripping involves the removal of the cargo from the container. The cargo is then repackaged, if necessary, and loaded on one or more trucks for the balance of its journey to the ultimate consignee.[2] An additional fee over and above that charged for "House to House Traffic" is paid to the carrier by the shipper for a "Pier to Pier" shipment, to cover the cost of the additional services to be rendered.

All services performed by Clark in connection with the discharge of the two containers from the DEFIANCE on September 10, 1979, and the transportation of those containers to the container yard were classified by Clark as "Stevedoring Operations," and were billed as such by Clark to Farrell. All services performed by Clark in connection with the transportation of the container containing the three crates from the container yard to Shed No. 4 and the preparation of the contents of that container for inland shipment were classified by Clark as "Terminal Operations," and were billed as such to Farrell. Had the accident not intervened, Farrell would have been charged by Clark in the same way for the same services with regard to the "flat rack" container. Under the contract between Farrell and Clark, the schedule of rates for stevedoring operations differed from that for terminal operations. The cost of loading the three crates in the container which encountered no mishap, after those three crates had been removed from that container at Shed No. 4 and placed on the George's Transfer trailer for overland transport, was charged by Clark to Connor which in turn charged Koppers. Had the accident not intervened, the cost of loading the cargo contained in the "flat rack" container after it would have been processed at Shed No. 4 would also have been charged by Clark to Connor, and by Connor to Koppers.

The negligence of Joseph Letts, and, thus, the vicarious liability of Letts' employer, Clark, are admitted. The parties have stipulated that if Clark prevails herein, defendants are liable to plaintiffs jointly and severally in the amount of $500,[3] and that if plaintiffs prevail herein, defendants are liable to plaintiffs jointly and severally in the amount of $50,000, the agreed amount of damage to the contents of the "flat rack" container, plus prejudgment interest at the rate of ten percent from September 16, 1979, to date of judgment. The parties also agree that the crate containing the Bell Less Top Blast Furnace is a single package, for purposes of both the Carriage of Goods by Sea Act (COGSA) and the bill of lading.[4] The parties disagree as to whether defendant Clark is entitled to the $500 limitation of liability set forth in Section 4(5) of COGSA, 46 U.S.C. § 1304(5) and/or in a limitation of liability provision in the bill of lad-

---

**2.** One can also seemingly arrange for different combinations of preloading and post-discharge services, known as "Pier to House" or "House to Pier."

**3.** Five hundred dollars is the maximum liability if the bill of lading limitations provision prevails. *That* is the issue for decision herein and is discussed *infra*. Clark has some liability to plaintiffs herein, despite the fact that the bill of lading contains clauses (in addition to its limitation of liability provisions) which would appear to exonerate it from any liability whatso-

ever (see ¶ 1(a), quoted on p. 6 *infra*) because Section 3(8) of the Carriage of Goods by Sea Act, 46 U.S.C. § 1303(8), renders such a complete exemption from liability void. The parties are not in disagreement in that connection.

**4.** The applicable case law would seem to require the result the parties have reached by that agreement. *See Aluminios Pouzelo, Ltd. v. S.S. NAVIGATOR*, 407 F.2d 152, 155 (2d Cir. 1968); *Mediterranean Marine Lines, Inc. v. John T. Clark & Son of Maryland, Inc.*, 485 F.Supp. 1330, 1337–9 (D.Md.1980) (Harvey, J.).

ing issued by Farrell.[5] That section, Section 4(5) of COGSA provides in relevant part:

(5) Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package ... unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading.

The relevant part of ¶ 16 of the bill of lading states:

In case of any loss or damage to or in connection with goods exceeding in actual value the equivalent of $500.00 ... the value of the goods shall be deemed to be $500.00 per package .... The carrier's liability, if any, shall be determined on the basis of a value of $500.00 per package ... or pro rata in case of partial loss or damage, unless the nature of the goods and a valuation higher than $500.00 per package ... have been declared in writing by the Shipper, upon delivery to the Carrier and inserted in this bill of lading and extra charge paid.[6]

In *Robert C. Herd & Co. v. Krawill Machinery Corp.*, 359 U.S. 297, 79 S.Ct. 766, 3 L.Ed.2d 820 (1959), the Supreme Court concluded that the combination of the COGSA § 4(5) limitation of liability, and a similar limitation in a bill of lading such as that in ¶ 16 of the bill of lading involved herein, contractually extends to third parties only if the intent to have such third parties as beneficiaries of those limitations is clearly and unambiguously expressed in and provided for by the bill of lading. In the within case, ¶ 1 of the bill of lading, in relevant part, reads as follows:

(a) The Carrier shall be entitled to the full benefit of, and right to, all limitations of, or exemption from liability authorized by ... [COGSA] .... The terms of this bill of lading constitute the contract of carriage, which is between the shipper, consignee and authorized owner of the goods, and the Carrier, owner or demise charterer of the vessel designated to carry the shipment. It is understood and agreed that other than the Carrier, shipowner or demise charterer, no person firm or corporation or other legal entity whatsoever (including the Master, officers and crew of the vessel, all agents, employees, representatives, and all *terminal operators, stevedores,* watchmen and other independent contractors whatsoever) is, or shall be deemed to be liable with respect to the goods as carriers, bailee, or otherwise howsoever, in contract or in tort. *If, however, it shall be adjudged that any other than said shipowner or demise charterer is carrier or bailee of the goods or under any responsibility with respect thereto, all limitations of and exonerations from liability provided by law or by the terms hereof shall be available to such other. In contracting for the forgoing exemptions, limitations and exonerations from liability, the Carri-*

5. The parties have filed cross motions for summary judgment which are ripe for decision in view of the lack of dispute concerning relevant and material facts. *See* note 1 *supra.*

Subject matter jurisdiction is present herein. Plaintiff Koppers is a Delaware corporation with its principal place of business in Pennsylvania. Plaintiff Wurth is incorporated and has its principal place of business in the Grand Duchy of Luxembourg. Plaintiff Republic is a New Jersey corporation with its principal place of business in Ohio. Defendant Farrell is a New York corporation with its principal place of business in that state, while defendant Clark is a Maryland corporation with its principal place of business in Maryland.

Admiralty jurisdiction exists over plaintiffs' claims against Farrell and the ship, but may not be present with regard to plaintiffs' claims against Clark, since Clark did not sign and was not a party to the bill of lading applicable herein. *See Leather's Best, Inc. v. S.S. MORMACLYNX,* 451 F.2d 800, 807–08 (2d Cir. 1971) (Friendly, J.). However, diversity jurisdiction would appear to exist as to all of the parties herein. Further, since there would appear to be no difference between the law to be applied to the facts in this case by a federal court exercising admiralty jurisdiction and by a Maryland court applying Maryland law, there is no choice of law problem presented herein. *See LaSalle Machine Tool, Inc. v. Maher Terminals, Inc.,* 611 F.2d 56, 57 n.1 (4th Cir. 1979).

6. No declaration of higher value was made by the shipper (Wurth) nor was any extra charge paid by anyone.

er is acting as agent and trustee for the above mentioned.

(emphasis supplied).

The question arises as to whether Clark's status as stevedore, terminal operator and/or agent for Farrell, terminated upon the placement by Clerk of the two containers in the container yard, and whether services performed by Clark after that point were performed on behalf of one or more or all of plaintiffs and not on behalf of the carrier. Paragraph 12 of the bill of lading issued by Farrell reads as follows:

12. The Carrier's responsibility as Carrier for the goods shall not commence until the goods are safely stowed in the carrying vessel at the port of loading. Immediately upon arrival of the ship at the port of discharge, the Carrier may ... deliver the container(s) and/or goods onto any wharf, craft, or place that the Carrier or Port Authorities may select ... daytime or nighttime, no matter what the state of the weather or custom of the port may be.... It is agreed that delivery by the Carrier in any event shall take place upon discharge from vessel to a safe lighter or dock and that the responsibility of the Carrier in any capacity shall altogether cease when the goods have been discharged and possession is received by Customs or other authorities or by the operator or person in charge of any lighter, craft, wharf, store, warehouse, elevator or other facilities, whether selected by the shipper, consignee or owner of the goods or by port authorities or the Carrier unless it be shown that any loss or damage to the goods was caused by the Carrier's negligence in selecting the lighter or dock.... All charges and expenses of whatsoever nature, connected with the discharge, subsequent custody and delivery of the goods, shall be at the expense of those goods unless specifically included in the freight. *It is agreed that when possession of the goods is received or taken by Customs or other authorities or* by an operator of any lighter, craft, dock, pier store, warehouse, refrigerator, elevator or other facilities whether selected by the Carrier or Master, shipper or consignee, whether public or private, such authority or person shall be considered as having received delivery of the goods solely as agent of and on behalf of the shippers/consignee at the risk of the goods, subject to any lien of the Carrier thereon. The Carrier or Master may appoint a stevedore or other person to unload and take delivery of the goods and such delivery from the ship's tackle shall be considered complete and all responsibility of the Carrier shall then terminate. If the consignee does not take possession and delivery of the goods, as soon as the goods are at the disposal of the consignee, ... the goods shall be at their own risk and expense, delivery shall be considered to be complete and the Carrier may, subject to all liens, send the goods to store, warehouse, put them in lighters or other craft, put them in the possession of the authorities, dump, permit them to lie where landed or otherwise disposes [sic] of them always at the risk and expense of the goods, the shipper/consignee shall pay and indemnify the Carrier for any loss, damage, or fine, charge or expense whatsoever suffered or incurred in dealing with or disposing of the goods or by any reason of the consignee's failure and delay in taking prompt possession and delivery as provided herein. All responsibility of the Carrier shall altogether cease and the goods shall be considered to be delivered in any and all the ways described and provided for herein or otherwise.

(emphasis supplied).

Clark, at the time of the accident herein, was acting as an independent contractor performing services for Farrell. Further, since Clark's performance of its contractual duties to Farrell was subject to the general control and supervision of Farrell, Clark was acting as Farrell's agent.[7]

---

**7.** *See Leather's Best, Inc. v. S.S. MORMACLYNX*, 451 F.2d 800, 808 n.6 (2d Cir. 1971) (Friendly J.). Cf. *Mediterranean Marine Lines,* *Inc. v. John T. Clark & Son of Maryland, Inc.*, 485 F.Supp. 1330, 1336, 1340 (D.Md.1980) (Harvey, J.).

The services performed by Clark at the time of the accident were being performed for Farrell. The contract between Farrell and Clark called for Clark not only to provide Farrell with stevedoring services, but also so called "extra labor" services as well. The extra labor services included the services Clark was rendering at the time of the accident, *i.e.*, transportation of containers from the container yard to Shed No. 4 for the purpose of stripping them, and then repackaging and loading the cargo contained in them for inland transport. Clark was paid for those extra labor services by Farrell, and, in rendering such services, was under Farrell's general control. An employee of Farrell, titled the Terminal Manager, was at all times stationed at Dundalk Marine Terminal for the purpose of supervising and overseeing activities at the container yard and at Shed No. 4.[8]

Plaintiffs, relying on *De Laval Turbine, Inc. v. West India Indus., Inc.*, 502 F.2d 259 (3d Cir. 1974), contend that evidence of the relationship between Farrell and Clark extrinsic to the bill of lading itself is inadmissible because the bill of lading itself, in ¶ 12, provides that Clark, at the time of the accident, was acting as agent for the shipper and consignee. In that case Judge Garth wrote (at 269):

> An independent contractor can also be an agent. The Restatement (2d) of Agency, § 14N provides:
>> One who contracts to act on behalf of another and subject to the other's control except with respect to his physical conduct is an agent and also an independent contractor.
> As Comment a to that section states,
>> "independent contractor" is a term which is antithetical to the word "servant", although not to the word "agent". In fact, most of the persons known as agents, that is brokers, factors, attorneys, collection agencies, and selling agencies are independent contractors as the term is used in the Restatement of this Subject, since they are contractors but, although employed to perform services, are not subject to the control or right to control of the principal with respect to their physical conduct in the performance of their services. However, they fall within the category of agents. They are fiduciaries; they owe to the principal the basic obligations of agency: loyalty and obedience.... Colloquial use of the term excludes independent contractor from the category of agent ... but ... there

While we recognize that evidence of prior dealings is generally admissible to explain the intent of contracting parties, we understand *Herd & Company v. Krawill Machinery Corp., supra*, to preclude reliance upon such evidence in this context. It is inconsistent to require a clear expression of intent on the one hand while on the other resorting to extrinsic sources—of which the contracting parties may or may not have actually been aware—to interpret the documents. If the negotiating parties do not limit the liability of third parties within the "four corners" of the documents, we will not recognize an extension of COGSA protection. Accordingly, we cannot treat as dispositive the district court's findings of fact with regard to the prior practices of De Laval [the shipper].

(footnote omitted). In that case, the two stevedoring companies were contending that De Laval had agreed contractually with the carrier to limit the liability of the stevedores. Judge Garth looked at the bill of lading and refused to read the bill of lading in the light of "previous dealings of those parties." *Id.* at 268–69. It would appear that the Third Circuit's precise holding in *De Laval Turbine* was that extrinsic evidence is inadmissible for purposes of es-

> is an agency if in the transaction which . . . [the independent contractor undertakes its acts] for the benefit of another and subject to his control.

The Fourth Circuit, as a matter of federal admiralty law, and citing § 14N, has recognized that "[a]n independent contractor too may be an agent; the terms are not mutually exclusive." *Smith v. United States*, 346 F.2d 449, 453 (4th Cir. 1965) (Bryan, J.). While no Maryland cases seem to have relied upon § 14N or to speak to that proposition, a commentary on Maryland law (1 Md. Law Encyclopedia, *Agents and Factors*, § 2 at 361) states:

> While an independent contractor and an agent are not always easy to distinguish, and there is no uniform criterion by which they may be differentiated, the usual test is whether the purported principal retained some measure of control over the purported agent's activities.

8. *See* deposition of Henry Fitzer, filed August 25, 1981 (Doc. 24), at pp. 1–2.

tablishing that an entity is included as a beneficiary of the bill of lading's limitation of liability clause. But, to read that case as concluding that extrinsic evidence is never admissible to establish that an entity such as Clark was *acting* as an agent of Farrell and as a stevedore and/or terminal operator within the meaning of those words as they are used in ¶ 1(a) of the bill of lading constitutes an over-broad reading.[9]

Further, in any event, plaintiffs' interpretation of ¶ 12 of the bill of lading involved in this case would not seem correct. That paragraph speaks to a situation in which cargo is off loaded from a vessel without the necessity for any further activity with regard to such cargo on the part of the carrier. In other words, that clause relates to shipments such as "House to House" or "Pier to House" shipments. Those types of shipments are "delivered" to the consignee by the carrier once the carrier has satisfied the requirements of ¶ 12.[10] At that point, but not until that point, the contract of carriage, represented by the bill of lading, is at end and the rights and responsibilities of the carrier (and its agents) are also at end.[11]

The "Pier to Pier" designation on the face of the bill of lading, serves to push back the point of delivery to the consignee or his agent until such time as the services called for by that designation have been completed. Thus, in the within case, delivery to Koppers, the consignee, or its agents, would not have taken place until the two containers in which its cargo was shipped had been taken from the container yard to Shed No. 4 and stripped, and the cargo had been removed from them, repackaged (if necessary), and prepared for loading or loaded upon the trucks operated by George's Transfer for the inland portion of

9. Courts have often allowed the introduction of parol or extrinsic evidence for the purpose of interpretation of clauses of bills of lading which do not involve liability limitations, when such evidence is not admitted to vary the terms of a written integrated agreement. *See, e.g., Standard Brands, Inc. v. Eastern S.S. Lines, Inc.*, 97 F.2d 918, 920 (2d Cir. 1938); *Royal Exchange Assur. of America, Inc. v. S.S. President Adams*, 510 F.Supp. 581, 584–85 (W.D.Wash. 1981).

10. *Cf. Allstate Ins. Co. v. Imparca Lines*, 646 F.2d 166, 168–9 (5th Cir. 1981), in which the Fifth Circuit held that language in the bill of lading involved therein, some of which appears to be identical to the language in ¶ 12 of the bill of lading in issue herein, defined the point at which cargo is delivered both for purposes of the bill of lading itself and the Harter Act, 46 U.S.C. §§ 190 to 196. COGSA was held to be inapplicable in that case after discharge of the cargo, since that statute applies, according to § 1(e), 46 U.S.C. § 1301(e) during "the period from the time the goods are loaded on to the time when they are discharged from the ship."

Notwithstanding § 1(e), COGSA § 7, 46 U.S.C. § 1307 states:

Nothing contained in this chapter shall prevent a carrier or a shipper from entering into any agreement ... as to the responsibility and liability of the carrier or the ship for the loss or damage to or in connection with the custody and care and handling of the goods prior to the loading on and subsequent to the discharge from the ship on which the goods are carried by sea.

In the within case, ¶ 1 of the bill of lading provides, in pertinent part:

COGSA shall govern before the shipment is loaded on and after it is discharged from the vessel and throughout the entire time the goods are in the exclusive custody of the carrier until made ready for delivery.

Thus, for purposes of the within case, COGSA continued to apply even after discharge of the goods from the vessel.

The fact that *Allstate* construes "delivery" in a Harter Act context does not render its holdings inapplicable in a case, such as the within case, governed by COGSA:

... COGSA and Harter are at many points so much alike that the differences may be looked on as merely stylistic. For this reason, it is universal practice, followed here, to cite Harter Act cases to COGSA points, where applicable.

G. Gilmore & C. Black, The Law of Admiralty at 148 (2d ed. 1975). More importantly, in *Allstate*, the bill of lading did not call for "Pier to Pier" handling.

11. *See Mediterranean Marine Lines, Inc. v. John T. Clark & Son of Maryland, Inc.*, 485 F.Supp. 1330, 1340 (D.Md.1980), in which Judge Harvey stated that a freight forwarder was not entitled to the benefit of the limitation of liability in a bill of lading because, first, its services were not performed for the carrier, and second, its services were rendered predelivery to the carrier and therefore outside the time period covered by the bill of lading.

the journey. Until that time, the contract of carriage represented by the bill of lading continued in effect, and the rights and responsibilities of the carrier (and its agents) thereunder also continued in effect.[12] In addition, COGSA, including the § 4(5) limitation of liability, also continued in effect.[13]

However, the conclusion that Clark was acting as Farrell's agent at the time the accident occurred, even coupled with the conclusion that COGSA and the bill of lading were then in effect, does not, without more, entitle Clark to the $500 limitation of liability. In *Robert C. Herd & Co. v. Krawill Machinery Corp.*, 359 U.S., 297, 79 S.Ct. 766, 3 L.Ed.2d 820 *supra*, the Supreme Court expressly rejected the holding of the Fifth Circuit in *A. M. Collins & Co. v. Panama R. Co.*, 197 F.2d 893 (1952), characterizing that holding as follows:

> The premise of the majority opinion in ... [*Collins*] is that all agents of the carrier who perform any part of the work undertaken by the carrier in the contract of carriage, evidenced by the bill of lading, are, by reason of that fact alone, protected by the provisions of the contract limiting the liability of the carrier, though such agents are not parties to nor express beneficiaries of the contract.

359 U.S. at 303, 79 S.Ct. at 770. After discussing a number of Supreme Court cases which held that "an agent is liable for all damages caused by his negligence, unless exonerated therefrom, ... by a statute or a valid contract binding on the person damaged," *id.* at 303–4, 79 S.Ct. at 770–71, and other cases which held that "contracts purporting to grant ... limitation of liability must be strictly construed," *id.* at 304, 79 S.Ct. at 771, the Court stated:

> The holding of the majority in Collins that the liability of a negligent agent of a carrier, though not limited by any statute or contract, is nevertheless limited by and to the extent of the limitation granted by the shipper to the carrier in the bill of lading, simply because the agent is performing some part of the work thereby undertaken by the carrier, is clearly contrary to ... decisions of this Court.

*Id.* at 305, 79 S.Ct. at 771. Thus, under *Herd*, the further question to be answered herein is whether the bill of lading clearly and unambiguously extends to Clark the benefit of its and COGSA's $500 limitation of liability, regardless of whether Clark was acting as a stevedore or terminal operator[14] at the time of the accident.

Seemingly, Clark was performing terminal operator services at that time.[15] But

---

**12.** To the extent that the "Pier to Pier" designation and ¶ 12 of the bill of lading may be said to be in conflict with one another, the former would control over the latter. According to general rules of contract interpretation as set forth in Restatement (2d) of Contracts, § 203,

> In the interpretation of a promise or agreement or a term thereof, the following standards of preference are generally applicable:
>
> * * * * * *
>
> (d) separately negotiated or added terms are given greater weight than standardized terms or other terms not separately negotiated.

This principle has been accepted both in federal admiralty law and in the law of Maryland. *Burdines, Inc. v. Pan-Atlantic Steamship Corp.*, 199 F.2d 571, 572–73 (5th Cir. 1952); *Shapiro v. Chapin*, 159 Md. 418, 421–22, 151 A. 44 (1930). It applies not only to handwritten or typewritten modifications of or additions to a printed form contract, but also stamped modifications or additions. *Burdines, supra.*

**13.** See note 10, *supra.*

**14.** See n. 1, *supra.*

**15.** The Federal Maritime Commission has defined the services provided by terminal operators (*see* 46 C.F.R. § 533.6(d)) as follows:

> (d) Definitions of terminal services:
>
> * * * * * *
>
> (6) Handling: The service of physically moving cargo between point of rest and any place on the terminal facility, other than the end of ship's tackle.
>
> (7) Loading and unloading: The service of loading or unloading cargo between any place on the terminal and railroad cars, trucks, lighters or barges or any other means of conveyance to or from the terminal facility.

"Point of rest" is defined in 46 C.F.R. § 533.-6(c) as "that area on the terminal facility which is assigned for the receipt of inbound cargo from the ship and from which inbound cargo may be delivered to the consignee, and that area which is assigned for the receipt of outbound cargo from shippers for vessel loading." At the time the accident occurred, Joseph Letts

that conclusion is of little import herein since under ¶ 1(a) of the bill of lading, terminal operators as well as stevedores are listed among the entities which are the beneficiaries of the ¶ 16 and COGSA § 4(5) limitations of liability if one or more of them is deemed to be liable with respect to the goods as "carriers, bailee or otherwise howsoever." [16] Paragraph 1(a) is specific and clear, not ambiguous with regard to the inclusion of both stevedores and terminal operators as limitation of liability beneficiaries. Judge Harvey, in *Mediterranean Marine Lines, Inc. v. John T. Clark & Son of Maryland, Inc.* 485 F.Supp. 1330, 1336–67 (D.Md.1980), recently so concluded with regard to a bill of lading containing the identical language set forth in ¶ 1(a) of the bill of lading in this case, writing:

> It is argued initially that the third sentence [of ¶ 1(a)] is void because it completely exonerates from liability anyone who falls within its ambit. Next, it is urged that the fourth sentence is ambiguous because it extends the limitation of liability to "any other than said shipowner," and because the term "any other" cannot refer to the parties enumerated in the third sentence since the third sentence is void. This Court finds no merit to these arguments.
>
> Even were this Court to conclude that no legal effect could be given to the third sentence of Paragraph 1(a), that sentence would still retain its grammatical significance. The definite pronoun "other" in the fourth sentence relates grammatically to the parties enumerated in the third sentence, irrespective of the legal validity of the third sentence. Construing these two sentences together, this Court concludes that the bill of lading extends the limitation of liability to stevedores.

Judge Harvey was not dealing with a terminal operator. If he had been, there is no reason to believe he would have treated a terminal operator differently than a stevedore or differently from an entity operating as both stevedore and/or terminal operator close to, if not at the time, the accident occurred.[17]

---

seemingly was engaged in "handling" services, *i.e.* moving cargo from the container yard to a different place in Shed No. 4.

**16.** At the time of the accident, *i.e.*, during the post-discharge/pre-delivery phase of operations, Clark was, under Maryland law, a bailee of the cargo. *General Refining Co. v. International Harvester Co.*, 173 Md. 404, 414, 196 A. 131 (1938); *The Broadview Apartments Co. v. Baughman*, 30 Md.App. 149, 150, 350 A.2d 707 (1976).

In *De Laval Turbine, Inc. v. West India Indus., Inc.*, 502 F.2d 259, 269–70 (3d Cir. 1974), the Court held that the term "bailee," by itself, was "too general a category to support a limitation of liability," and went on to hold that in order to satisfy the test of *Herd, supra*, "there must be a specific link between the contract term and the party to be protected ...." Herein, that specific link—the inclusion of "terminal operator" and "stevedore" in listing in the third sentence of ¶ 1(a) of the bill of lading—is present.

**17.** Paragraph 1(b) of the bill of lading in this case reads as follows:

> Because the Carrier requires persons and companies to assist it in the performance of all work and services undertaken by it in connection with the goods described herein, as well as the goods of others transported or to be transported by the Carrier, it is express-

ly agreed between the parties hereto that the Master, officers, crew members of ocean vessels, barges or tugs used in performing or assistant in the carriage hereunder, and all other agents, representatives, independent contractors, stevedores, towers used, engaged or employed by the Carrier, shall be a beneficiary of this bill of lading and shall be entitled to all exemptions and immunities from and limitations of liability which the Carrier has under this bill of lading, and under COGSA, Canadian Water Carriage of Goods Act, enactment or convention, which is applicable under Clause No. 1 hereof, and by entering into the provisions of this bill of lading, the Carrier to the extent of such provisions, does so not only on its own behalf but also as agent and trustee of each person and company described above, all of whom shall to this extent be deemed to be a party to the contract evidenced by this bill of lading. It being always understood that said beneficiaries are not entitled to any greater or further exemptions, immunities, or limitations of liability than those that the Carrier has under this bill of lading in any given situation

Plaintiffs contend that ¶ 1(b) does not refer explicitly to terminal operators and that its provisions prevail over the provisions of ¶ 1(a) at least so as to exclude limitation of liability for terminal operators. In *B. Elliott (Canada)*

In *De Laval Turbine, Inc. v. West India Indus., Inc.,* 502 F.2d, *supra,* at 269 (3d Cir. 1974), the bill of lading contained language identical to that in the fourth sentence of ¶ 1(a) of the bill of lading here,[18] but seemingly different from the language in the third sentence thereof since, *inter alia,* the words "stevedores" and "terminal operators" appear absent. Judge Garth, however, refused to extend the $500 limitation of liability to a stevedore under that language:

> [W]e note that the term "other" is ambiguous. Does the term refer to any other person/business? Or is the term more limited, referring only to a particular class of persons (*e.g.,* any substituted carriers)? The bill of lading provides neither answers nor clues to these questions.

The bill of lading in the within case, however, as Judge Harvey indicated in dealing with identical language in *Mediterranean Marine Lines* does provide those missing answers and clues as to defendant Clark because the third sentence of ¶ 1(a) of the bill of lading specifically lists stevedores and terminal operators as beneficiaries of the COGSA and bill of lading limitation of liability provisions.

A comparison of the language of the bill of lading at issue herein with the bill of lading discussed by the Second Circuit in *Cabot Corp. v. S.S. MORMACSCAN,* 441 F.2d 476 (2d Cir.), *cert. denied sub nom. John W. McGrath Corp. v. Cabot Corp.,* 404 U.S. 855, 92 S.Ct. 104, 30 L.Ed.2d 96 (1971) is also instructive. In that case, clause 2 of the applicable bill of lading (which is reprinted at 441 F.2d at 478) provided:

> In this bill of lading, ... *the word "carrier"* shall include the ship, her owner, operator, demise charterer, time charterer, master and any substituted carrier, whether acting as carrier or bailee, and *all persons rendering services in connection with performance of this contract* ....

(emphasis in the opinion). Clause 13 of the bill of lading stated, *inter alia,* that the carrier's liability "in any capacity" was to be limited to $500 per package. *Id.* In holding that a stevedoring company which had negligently damaged the plaintiff's goods while loading another shipper's cargo on the vessel was not entitled to the benefit of the limitation of liability, the Court stated:

> One can only guess whether clause 13 which speaks in terms of the "carrier's liability in any capacity" is intended to incorporate the phrase "all persons rendering services in connection with performance of this contract" from clause 2, and, indeed, initially, whether "all persons rendering services" is designed to include stevedores loading the goods of another shipper.
>
> ... [A]n intention to extend benefits of the limitation in the present bill to the stevedore would most naturally have been expressed by the addition of the term "stevedore" to the long list of various persons included under the definition of "carrier" in clause 2. In *Carle & Montanari, Inc. v. American Export Isbrandtsen Lines, Inc.,* 275 F.Supp. 76 (S.D.N.Y.), aff'd per curiam, 386 F.2d 839 (2d Cir. 1967), cert. denied sub nom. *Carle*

Ltd. v. John T. Clark & Son of Maryland, Inc., Civil No. Y–81–2088, (D.Md. 7/13/82), Judge Young, dealing with many of the same issues present in this case, wrote, *inter alia,* (at p. 7):

> If any one conclusion can be drawn from a reading of ¶¶ 1(a) and (b), it is that these paragraphs, taken together, constitute the Himalaya Clause, and when read *in pari materia,* form a clause benefitting specific third parties to the bill of lading. Clark, as a terminal operator, is entitled to the benefits conferred under ¶ 1(a) since that paragraph specifically names terminal operators as one of the beneficiaries, irrespective of the merits of the contention that terminal operators are not entitled to the benefits conferred under

¶ 1(b). In cases involving language in the bill of lading identical to that in ¶ 1(a), courts have held that the benefits to third parties include COGSA limitations of liability. *Carle & Montanari, Inc. v. American Export Isbrandtsen Lines,* 275 F.Supp. 76 (S.D.N.Y. 1967), *aff'd,* 386 F.2d 839 (2d Cir. 1967), *cert. denied,* 390 U.S. 1013, 88 S.Ct. 1263, 20 L.Ed.2d 162 (1968); *Mediterranean Marine Lines, Inc. v. John T. Clark & Son of Maryland, Inc.,* 485 F.Supp. 1330 (D.Md.1980). (footnote omitted).

**18.** Paragraph 1(a) of the bill of lading is set forth *supra* at pp. 1360–1361.

*& Montanari v. John W. McGrath Corp.*, 390 U.S. 1013, 88 S.Ct. 1263, 20 L.Ed.2d 162 (1968), the benefit of the $500.00 limitation was extended to the same stevedore involved here, but the bill of lading included the language "all agents and all stevedores." 275 F.Supp. at 78. The failure to include similar language here would lead one to believe that the protection of stevedores against liability was not intended. In any case, such an intention was not expressed with sufficient "clarity of language."

441 F.2d at 479. In the instant case, by contrast, both the terms "stevedore" and "terminal operator" are included in ¶ 1(a), and thus entities performing stevedore and/or terminal operator functions are expressly within its coverage. Under the circumstances, one need not "guess" whether Clark was intended to be the beneficiary of the $500 limitation of liability expressed in either COGSA § 4(5) or ¶ 16 of the bill of lading applicable herein. The language itself of ¶ 1(a) makes it clear that such an intent was present regardless of whether Clark was performing at the time of the accident as stevedore or as terminal operator.[19] Accordingly, plaintiffs are entitled to judgment herein against defendants only in the amount of $500. An Order to that effect is today being entered.

**B. ELLIOTT (CANADA) LTD.**

v.

**JOHN T. CLARK & SON OF MARYLAND, INC.**

Civ. No. Y–81–2088.

United States District Court, D. Maryland.

July 13, 1982.

---

**19.** See note 1 *supra*.