GENERAL REFINING COMPANY *v.* INTERNA-
TIONAL HARVESTER COMPANY, INC., ET AL.

[No. 76, October Term, 1937.]

*Decided January 13th, 1938.*

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*J. Calvin Carney,* with whom were *E. Milton Altfeld, J. Yale Gordon,* and *Preston A. Pairo* on the brief, for the appellant.

*William D. Macmillan,* with whom were *Semmes, Bowen & Semmes* on the brief, for the appellee.

OFFUTT, J., delivered the opinion of the Court.

On July 22nd, 1936, a truck loaded with 3,500 gallons of kerosene and weighing about twenty tons, which was owned by the General Refining Company, and driven by Henry R. Steinert, its employee, while proceeding north on the Bel Air Road, "became disabled" at a point about three miles south of Bel Air, and stopped. Steinert thereupon called his employer, and in response to that call Fred P. Esbrandt, its plant manager in Baltimore, called the International Harvester Company and instructed it to send a man to repair the tractor on the

road. It agreed to send a man to make the repairs and, pursuant to that undertaking, one Horwath, an employee of the International Harvester Company, from which the General Refining Company had purchased the truck, was sent to it with a towing truck. When he arrived he found, in addition to the disabled truck, a smaller truck which had been sent by the refining company to unload the kerosene. Horwath announced that he had been ordered to "pull the truck," and, without waiting for it to be unloaded, attached the disabled truck to his towing truck with a twelve-foot chain and attempted to tow it into Bel Air with Steinert at the wheel of the disabled truck to guide it and operate the brakes. In descending a grade the disabled truck began to overrun the tow truck, which suddenly increased its speed to avoid a collision. As the tow truck increased its speed, it swung the refining company truck "to the left and then to the right", so that it overturned and was wrecked. Thereafter, the refining company brought this action in the Court of Common Pleas of Baltimore City against the International Harvester Company to recover for the damage to its truck, on the theory that it was caused by the defendant's negligence.

At the close of the plaintiff's case the court directed a verdict for the defendant on the ground that it appeared from the uncontradicted evidence that negligence on the part of the agents and servants of the plaintiff directly contributed to the happening of the accident. The appeal is from the judgment on that verdict.

The evidence in the case tended to prove facts which appear in the following narrative: When Horwath first arrived on the scene he said that "he got orders to pull the truck." Steinert then said, "Well we got orders to unload it first, from the Bel Air plant." Steinert then moved the disabled truck a few feet so that Horwath could "hear the transmission," "and he decided he had to pull the truck." The disabled truck included two units, a tractor and a trailer, so that, when the towing truck was attached to the tractor, there were three units fast-

ened together; the towing truck, the tractor, and the trailer. Before Horwath attached the tow truck to the tractor, Steinert said to him: " 'Brother, this is a vacuum system tractor, I won't be in gear because I can't use my transmisson, but I will keep the motor running, that will give me the brakes; but please pay attention to me back there in case I burn my brakes off coming down the hills,' that I would attract his attention by my air horn, which I blasted I don't know how long, and no one didn't seem to pay any attention to me, what was going on up front in that cab I couldn't tell you; I couldn't see through the back of the cab, so I done to the best of my knowledge, I picked out by place, what I was going to do; no matter where I went I would have to go over the chain." Horwath, however, decided to take the risk and tow the disabled truck to Bel Air without unloading it, and fastened the tractor to the towing truck with two "pieces of broken chain."

In the course of the cross-examination of Steinert as to his assent to Horwath's plan of towing the disabled truck to Bel Air before unloading it, he gave this testimony: "The truck couldn't be towed unless you ran in gear, unless you used that tow bar, and that he didn't have, because that weight was too big to be on back of a chain. Q. Well, did you think of that before you started to be towed? A. Yes, sir. He said he had none, and he decided he was going to tow that truck, and he sent our little truck away. Q. Well, of course, he couldn't really have towed your truck unless you wanted him to do it, could he? A. I didn't want him to do it. Q. You mean to tell this Court and jury that you really didn't want that man to tow the truck? A. Absolutely. I had my orders. Q. Well, then, why did you let him tow it? A. Because he intended to tow the truck, he hooked up to it and sent the other driver away. Q. And you just fell in line and let him do what he wanted to do, is that right? A. It wasn't up to me. He told me he had his orders, and that was that. Q. From the very beginning did you think this was going to be a very dangerous job?

A. I did.   Q. You really did?   A. That's the reason I explained everything to the man, before I—   Q. Did you feel there was going to be an accident?   A. Well, I didn't feel there was going to be an accident but I felt like it was a tedious job to move a truck that size with a load on it.   Q. Well, if that's the way you felt about it, why didn't you really then use a little more insistence, and say to this man 'I am not going to allow you to tow this truck, I think it is unsafe'?   A. Well, this man, he used his insistence on me, saying that he knew what he was doing.  He was the best man the company had, so they said.   Q. But, after all, you were the one asking for assistance, weren't you?  You called in for the assistance?   A. I called in for assistance, but that wasn't what they sent him there for.  He was supposed to unload the truck before he towed it.   Q. Did you stop him from unloading it?   A. I didn't stop him from unloading it. The driver of the International told the other man he could have me in Bel Air in five minutes.  We were only about five miles outside of Bel Air."

When they started to Bel Air the brakes on the disabled truck were in perfect condition, but the truck could not be driven in gear because the transmission was "torn to pieces."   After they "got under way," Steinert had "to hold plenty to hold that thing back from creeping up on this man," and, when finally his truck did begin to creep up, he tried to attract Horwath's attention by repeatedly sounding his horn.   For a time Horwath paid no attention to him and the front wheel of the disabled truck crossed the slack of the twelve-foot tow chain. When Horwath's attention was finally attracted to the situation, "the tractor and trailer was alongside and to the left of the tow truck with the front of the tractor about four or five feet past the rear of the truck."   Horwath then, Steinert said, "started off with an enormous amount of speed to get away from me, and that's what upset me; he whipped that chain up around the top of the wheel and it swung me hard to the right, and whipped me back, which turned the front of the truck over and

that trailer stood up on its nose and flopped over and the load ran out on top of me, and our other driver ran back and held my head up out of it to keep it from running across my face; and this other man was running up and down the road there, he didn't know what to do."

Aubrey S. Harkins, manager of appellant's Bel Air plant, ordered two trucks to unload the kerosene from the disabled truck, and never countermanded that order, and, when he arrived at the point where the truck was disabled, he so informed Horwath, but Horwath said, " 'Never mind, it isn't going to be hard to pull.' I said, 'Well, I have got the trucks here for this unloading.' He said: 'It's no use; save all the work we can. I will tow it to Bel Air. It won't be much to tow, and no trouble.' And I also made the remark to him I didn't think much of the idea of towing it with a chain."

Fred P. Esbrandt, appellant's Baltimore plant manager, said: "He received a call from Steinert that his tractor was disabled near Bel Air; at that time they did not have mechanics at the plant for the purpose of making repairs to the tractors. He called the International Harvester Company and instructed them to send a man to repair the tractor on the road; the tractor was an International Tractor and he was informed by some one of the International Harvester Company that they would send a repair man to take care of it, and that the mechanic was to do all he could to repair the job on the road, if not, he was to take him back to Baltimore if he could not repair it on the road." An examination of the brakes of the appellant's trailer truck after the accident disclosed that they were in very bad condition.

At the close of the plaintiff's case, the defendant offered two prayers; one a general demurrer to the evidence; two, a peremptory instruction that the uncontradicted evidence showed that the negligence of the plaintiff, its servants and agent, contributed to the happening of the accident, and that the verdict of the jury must for that reason be for the defendant. The first prayer was refused and the second granted.

The questions submitted by the appeal are two: one, whether there was legally sufficient evidence of primary negligence, for, if there was not, then the judgment should not be reversed even though there was error in granting the contributory negligence prayer, and, two, was the defendant guilty of contributory negligence as a matter of law.

The trial court decided that there was legally sufficient evidence of primary negligence, and in that conclusion we fully concur. Conceding the truth of the plaintiff's evidence, which the demurrer does, it may be found that the defendant's agent, notwithstanding plain and repeated warnings of the danger of the plan, undertook to tow by a twelve-foot chain a twenty-ton truck which could neither be driven nor towed in gear, over a hilly road, and that, in the course of that operation, not only did he fail to keep a constant watch to note the progress and situation of the disabled truck, but he was so oblivious of the dangers of the situation and so inattentive that he failed to hear the sound of the horn which the driver of the disabled truck sounded to warn him that that truck was in danger. Steinert, when asked how often he sounded his horn, said: "I just couldn't say just how many times but it was an enormous amount, because I began to get jittery in there at what was facing me; and I could have left the truck and let him have them both, but I tried my best to stop that truck because it had inflammable merchandise on board." Moreover, when Horwath finally saw the danger, he increased the speed of his own truck so suddenly, and so much, that it whipped the tow chain over the front wheel of the disabled truck, swung it to the right, and then "whipped" it back, so that it was inevitably overturned. There can be no reasonable doubt that such conduct manifested a heedless indifference to a patent and obvious danger which can only be characterized as reckless, and it needs no citation of authority to support the conclusion that it afforded legally sufficient evidence of primary negligence.

The substantial question in the case is whether the facts stated above establish the plaintiff's contributory negligence as a matter of law. Although variously expressed, the appellee's contention appears to be the plan offered by Horwath for towing the disabled truck to Bel Air was inherently and obviously dangerous; that since the plaintiff's employees did not prevent Horwath from carrying it out, and since one of them, Steinert, actually steered the disabled truck while it was towed, the acquiescence and co-operation of these employees in the plan must be assumed, and constituted negligence in law; that these employees were agents of the plaintiff and their negligence must be therefore imputed to it.

Appellant's contention is that its truck was in the care, custody, and control of the defendant, its servants, and employees, that the accident occurred as a result of their negligence (1) in towing the truck before it was unloaded, (2) in towing it with a chain, and (3) in towing it negligently and unskillfully; that it neither assented to nor participated in the work of towing it, and is not therefore guilty of any negligence which contributed to the happening of the accident.

The decisive factor common to both of these contentions, which seem to deal rather with the doctrine of assumed risk, or joint adventure, than contributory negligence, is whether the evidence conclusively proves that the plaintiff assented to the plan of towing the loaded truck to Bel Air.

The plaintiff appears to have had, at the place where the kerosene truck stopped, before Horwath began to tow it to Bel Air, three employees, Steinert, driver of the disabled truck, Harkins, manager of the Bel Air plant of the plaintiff, and Minnick, who drove the small truck sent to unload the kerosene. Minnick was a mere bystander; it does not appear that he was authorized to say anything, or to do anything else, and he said little and did nothing. Harkins appeared in the role of a vice principal. He told Horwath that he would have trucks to unload the kerosene, and that he did not think much

of the "idea of towing" the truck with a chain. Horwath, however, said: "I will tow it to Bel Air." He was the representative of the Harvester Company, he had been sent for the specific purpose of repairing the truck, it was impossible to move it by its own power, he said that he had orders to move or "pull" it, and he insisted on moving it before it was unloaded.

Esbrandt, Baltimore manager of the plaintiff, and superintendent of its employees, when he instructed the Harvester Company "to send a man to repair the tractor on the road," was told "by some one of the International Harvester Company that they would send a repair man to take care of it," who "was to do all he could to repair the job on the road; if not, he was to take him back to Baltimore if he could not repair it on the road." When defendant's agent said that "he was to take him" back to Baltimore, he must have necessarily mean by "him" the disabled truck, first, because Esbrandt was not at the scene; second, because the repair man came himself in a towing truck; and third, because, unless it was possible to repair the truck on the road, it would have been necessary to move it in some way to a place where it could be repaired.

Steinert was a mere chauffeur whose duty it was to drive the truck which broke down. When it became disabled and he could no longer drive it, that duty was at an end. When he notified his employer of the breakdown he was ordered to unload the truck, and he so informed Horwath. Except for that work, he had, so far as the record shows, no other duty to perform with respect to the truck, and certainly he had no authority to act for his employer, in approving or disapproving the plan of towing it to Bel Air. Manifestly he was not authorized to disregard and disobey the express instruction of his employer.

Moreover, under those circumstances it cannot be said as a matter of law that because Harkins, the vice principal, and Steinert and Minnick, mere employees with limited duties, failed to peremptorily override the express

orders which the representative of the Harvester Company said he had received from it, they assented to, ratified, or approved his conduct in towing the loaded truck without a draw bar. Nor should it be necessarily inferred, from the fact that Steinert attempted to guide the truck while Horwath towed it, that he was authorized to or did assent to the plan, for it may well have been inferred that in doing that he was not acting within the scope of his employment, and that Horwath knew that he was not.

There is nothing to justify the inference that Esbrandt, who ordered the Harvester Company to make the repairs, or Harkins, who was present when it was moved, had any reason to know that in towing the truck Horwath was not acting in accordance with instructions from his employer. He was in possession of defendant's towing truck for the definite purpose of repairing it, and the truck which he drove was adapted to the very purpose for which he said he had been ordered to use it. Under those circumstances Harkins may properly have assumed that Horwath was authorized by his employer to move the disabled truck, and the plaintiff can neither be charged with contributory negligence as a matter of law, nor be held as a joint adventurer, nor to have assumed the risk of the plan, merely because Harkins did not expressly forbid Horwath from carrying out what he said his employer had directed him to do.

The defendant, when its employee attached its towing truck to the disabled truck, took possession of it as a bailee. It had informed Esbrandt that it would send a "repair man to take care of it," that "the mechanic" would do all he could to repair it on the road, and that he would take it back to Baltimore if he could not repair it there. It is true that Horwath, the mechanic, undertook to tow it to Bel Air instead of to Baltimore. That, however, was a mere administrative detail, wholly within the discretion of the repairman, and did not affect the relation between the appellant and the appellee. What the plaintiff wanted was to have its truck repaired; it

was quite indifferent to where it was repaired or how it was repaired. It turned the matter of repairing it over to the defendant, leaving the method, manner, and place of repairing it to its discretion. Delivery of the truck under those circumstances to defendant's agent was a bailment.

A bailment is said, in *Dobie on Bailment and Carriers*, to be: "The relation created through the transfer of the possession of goods or chattels, by a person called the bailor to a person called the bailee, without a transfer of ownership, for the accomplishment of a certain purpose, whereupon the goods or chattels are to be dealt with according to the instructions of the bailor." Other definitions cited by Dobie are these: "Bailment is defined by Sir William Jones (*Jones, Bailments*, 1) as being a delivery of goods in trust, on a contract, express or implied, that the trust shall be duly executed, and the goods redelivered as soon as the time or use for which they were bailed shall have elapsed or been performed. According to Judge Story (*Story, Bailments*, ch. 1, sec. 2) a bailment is 'a delivery of a thing in trust, for some special object or purpose, and upon a contract, express or implied, to conform to the object or purpose of the trust.' In *Kent's Commentaries* (2 Kent, Comm. [4th Ed.] sec. 40, p. 558) a bailment is said to be 'a delivery of goods on trust, upon a contract, express or implied, that the trust shall be duly executed, and the goods restored by the bailee, as soon as the purpose of the bailment shall be answered.' "

The particular kind of bailment effected by the contract between the parties to this appeal has been described as a *"locatio operis faciendi"* or hired work and labor about a thing. *Ibid.* page 11. Berry, in his work on *Automobiles*, states that: "When an automobile is delivered to one who agrees to repair it for a consideration, the contract is one of bailment for hire, and the bailee is required to exercise ordinary care for its protection." Page 1359. See, also *Blashfield, Cyc. Automobile Law*, sec. 37;

6 *Amer. Juris.* 354, 355; 15 *A. L. R.* 690; *Huddy, Automobiles,* sec. 255.

To constitute a bailment there must be an existing subject-matter, a contract with reference to it which involves possession of it by the bailee, delivery, actual or constructive, and acceptance, actual or constructive. 6 *Amer. Juris.* 190 *et seq.* In this case it appears that there was a contract for the repair of the plaintiff's truck which involved possession of it by the defendant, notice by the plaintiff to the defendant of the location of the truck, its proposal to repair it at that place or at some other place, plaintiff's assent to that proposal, and delivery may be inferred from the fact that defendant's servant took possession of it at that place by actually towing it therefrom. *Dobie on Bailment and Carriers,* sec. 10; 6 *Amer. Juris., Bailments,* secs. 64, 65, 67. So that all the requirements of a valid bailment are gratified and the transaction between the plaintiff and the defendant in respect to plaintiff's truck was a bailment (*Huddy, Automobiles,* sec. 256; *Berry, Automobiles,* sec. 1673; 65 *A. L. R.* 436; 15 *A. L. R.* 690), which may be classified as lucrative or a bailment for profit, for the mutual benefit of the parties. 6 *Amer. Juris.* 147 *et seq.* The bailee was therefore under a duty to use ordinary care and diligence in safeguarding the bailor's property, and subject to liability for any failure to perform that duty. 6 *Amer. Juris.* p. 333; *Amer. Dist. Tel. Co. v. Walker,* 72 Md. 454, 461, 20 A. 1.

Apart from its failure to prevent Horwath from towing the loaded truck, no conduct of the plaintiff can be characterized as negligent in law. But since both Horwath and plaintiff's employees knew that plaintiff had turned the truck over to the defendant to be repaired, plaintiff's employees should not be charged with negligence because they failed to revoke the orders of their employer. If Steinert were suing to recover for the injuries he received, it might be said that he had assumed the risk of injury when he consented to guide the disabled truck; but it does not appear that in guiding it

he failed to exercise the utmost care, skill, and diligence possible under the conditions. In undertaking that work, however, he was acting for himself and not for his employer. The employer had not authorized it, but on the contrary had assigned other work for him to do; that is, to unload the truck. Horwath, acting within the apparent scope of his authority, prevented Steinert from doing that work, but that fact did not authorize Steinert to depart from his instructions so as to bind his employer by his acts not within the scope of his employment, and Harkins, who was present, gave no orders of any kind either to Steinert, or to Horwath, after Horwath told him, "I (Horwath) will tow it to Bel Air."

For these reasons there was error in granting the defendant's second prayer, which ruling is the subject of the first and only exception submitted by the appeal. The judgment must therefore be reversed, and a new trial awarded.

*Judgment reversed, and new trial awarded, with costs to the appellant.*