**TRANSAMERICA ICS, INC.**

v.

**DEPENDABLE CONTAINER & CHASSIS SERVICE, INC. OF BALTIMORE.**

Civ. No. Y–84–3329.

United States District Court, D. Maryland.

Nov. 29, 1985.

Kieron F. Quinn and Robert B. Kershaw, Baltimore, Md., for plaintiff.

James R. Eyler and Stephen J. Hughes, Baltimore, Md., for defendant Dependable Container.

Roy L. Mason and Larry A. Ceppos, Baltimore, Md., for defendant Marine Repair Services.

Joseph A. Schwartz, III, Baltimore, Md., for third-party defendant Apex Oil Co.

JOSEPH H. YOUNG, District Judge.

## MEMORANDUM

Plaintiff Transamerica ICS, Inc. ("ICS") filed suit against Dependable Container Chassis & Service, Inc. ("Dependable") for the still-unexplained loss of 113 20-foot steel containers while the containers were in Dependable's care and custody pursuant to a depot agreement between the parties. Dependable brought a third-party action against Marine Repair Services of Maryland, Inc. ("Marine"), claiming that it had entrusted the containers to Marine's care. This Court heard the case without a jury October 18, 1985, and makes the following findings of fact and conclusions of law, whether or not so specifically designated.

## FINDINGS OF FACT

1. ICS is an owner and lessor of 20 and 40 foot intermodal shipping containers and is incorporated under the laws of the State of Delaware, with its principal place of business in White Plains, New York.

2. Dependable was a container depot operator between 1977 and March, 1984, and is incorporated under the laws of the State of Maryland, with its principal place of business prior to its cessation of business in March, 1984, in Baltimore City.

3. Marine Repair is a container depot operator with a place of business at 1701 Highland Avenue.

4. On or about April 1, 1980, ICS and Dependable entered into a written depot agreement for the repair and storage of ICS containers by Dependable in exchange for a fee. At all material times the aforesaid agreement was in effect between ICS and Dependable.

5. The depot agreement provided that Dependable would:

Use all reasonable care to protect the equipment of ICS in its possession from loss or damage and should be liable for any such loss or damage resulting from agent's lack of care or that of its employees, agents or servants.

6. Between January, 1981 and September, 1982, ICS delivered to the Old North Point Road depot facility operated by Dependable for storage hundreds of containers among which were 113 20-foot steel ocean-going shipping containers identified by container number.

7. Dependable repositioned ICS's 113 ocean-going shipping containers to its nearby Highland Avenue container storage facility for storage. By October 8, 1982, all of ICS's 113 containers had been repositioned to and were located upon the Highland Avenue container storage facility.

8. By letter agreement dated September 22, 1982, effective as of August 9, 1982, Marine Repair subleased Dependable's Highland Avenue container storage facility from Dependable and undertook all of Dependable's rights and obligations pursuant to its lease with Apex Oil Company pertaining to the property.

9. When Dependable vacated the Highland Avenue premises, it left a group of ICS containers, including the 113 missing ICS containers, on the Highland Avenue premises.

10. Dependable left the ICS containers in a long, narrow shed, piled three deep, where the containers were not easily visible and even a rough estimate of the number of containers in the shed was impossible upon casual visual inspection.

11. Vincent Marino, Vice President of Marine, requested that Henry Johnson, Vice-President of Dependable, remove the containers from the Highland Avenue premises. Johnson assured Marino that he would remove the containers within three months, and Marino agreed to let the containers remain on the site as a favor to Johnson.

12. Marine made repeated requests to Dependable to remove the containers from the Highland Avenue premises. Finally, after several months had passed and it became apparent that Dependable would not move the containers, Marino, Johnson, and Vincent Marino, Sr., the Corporate President of Marine, entered into a verbal agreement whereby Dependable agreed to pay Marine for the storage of the ICS containers until it could move the containers elsewhere.

13. Under the terms of the agreement Dependable agreed to pay Marine for storing the containers from the date Marine had sub-leased the Highland Avenue site. Dependable said that there were 323 ICS containers left at the Highland Avenue site. Marine accepted that figure without making its own inventory and billed Dependable on the basis of that number.

14. Despite the oral agreement, Marine made repeated requests to Dependable to remove the containers from the property. The arrangement was unprofitable for Marine because depot operators dealing with ocean-going containers make their profits from the repair of the containers, not stor-

age. In addition, the shed was a particularly valuable part of the Highland Avenue site because it protected containers from the elements, and Marine could not satisfy the requests of its customers to store other containers in the shed. As a result, Marine continually raised its storage charges to Dependable, eventually billing Marine $2,000 a month—three times the going industry rate—in an attempt to goad Dependable into removing the ICS containers.

15. Marine was aware that Dependable was experiencing financial difficulties at the time, largely as a result of a general downturn in the container industry. Dependable's other facilities were full of unused containers during the period 1982–January, 1984, and it had no place to put the ICS containers. Dependable was also experiencing management difficulties during that period. As a result, Dependable lagged behind in its payments to Marine for the storage of the ICS containers, paying over $17,000 to Marine from mid-1983 to the end of that year, but failing to pay $12,732 in additional charges that were due Marine.

16. In late 1983, Vincent Marino, Jr. finally entered into a direct leasing agreement with ICS for the storage of its containers at the Highland Avenue facility. As part of its agreement with Marine, ICS paid Marine the balance of $12,732 owed by Dependable for the storage of the ICS containers.

17. During this entire period all bills submitted by Dependable to ICS for storage charges relating to the containers at Highland Avenue were paid.

18. At the request of ICS, Marine conducted an inventory of the ICS containers at Highland Avenue in early 1984 and discovered that 113 of the containers were missing.

19. It is the custom in the ocean-going container depot business to keep inventory of all containers brought to the depot by use of a filing card system. The containers are numbered, and a separate card is maintained for each container. It is also the custom of the depot business to document transfers of the care and custody of containers with interchange receipts ("TIRs"). The TIRs reflect movements of containers in and out of a depot operator's control, and bear notations with respect to required repairs.

20. When Marine took over the subleased premises at Highland Avenue from Dependable, the offices of the depot were in a shambles. No inventory cards for the remaining ICS containers were found. Dependable did not send TIRs to ICS evidencing any change of control over the containers, and in fact continued to bill ICS for storage fees.

21. When Dependable vacated the Highland Avenue site, it left behind other containers in addition to the ICS containers. During the fall of 1982 Dependable dispatched some of those containers out of the Highland Avenue site. Marine performed the actual labor in moving the containers for a fee, but Dependable arranged for the customers to pick up the containers, took care of the paperwork, and generated TIRs reflecting those transfers.

22. During the whole period Dependable left the ICS containers at Highland Avenue, Dependable never conducted an inventory of the containers, and did not keep a card system on the containers or transfer a card system for the containers to Marine. Henry Johnson of Dependable occasionally visited the Highland Avenue site, but never conducted more than a casual visual inspection of the ICS containers.

23. Marine did not conduct an inventory of the ICS containers until requested to do so by ICS in early 1984. Marine considered the ICS containers a nuisance, the responsibility of Dependable, and made no attempt to move them or dispatch them.

24. The Highland Avenue site was an open industrial park. Dependable leased the premises from Apex Oil Company. Apex provided a security guard at the front entrance to the park. There was no evidence that either Dependable or Marine considered Apex responsible for security at the site. After working hours the site was deserted. A used container retailer apparently operated out of another part of the

site. There was no evidence that the security provided at the Highland Avenue site fell beneath the general security standards of the industry.

25. Removal of a single ICS 20-foot container from the Highland Avenue facility would require a forklift, a forklift operator, a chassis and a truck and driver to lift, load and remove the container from the depot.

26. Each of ICS's 113 containers were distinctively painted with ICS's red-brown color, and conspicuously identified with ICS's logos and container numbers and prefixes.

27. Investigation of the loss of its 113 containers has failed to establish the circumstances surrounding the loss or the location of any of the ICS containers.

28. There is no market for used, seaworthy containers. The evidence indicated that used, damaged containers sold for $700–1200 during 1982–1984. There was conflicting testimony regarding the price of new containers during the period.

29. ICS's 113 containers had a depreciated stated replacement value of $244,580. Depreciated stated replacement value is calculated by a formula which ICS uniformly used to value leasable used containers which are lost or constructively lost by damage. It is a method of valuation of leasable used containers used throughout the container leasing industry. ICS representative Emil Sommer testified that it cost ICS $2200 to buy new containers and ship them from Korea. The stated replacement value of the containers is thus less than their actual replacement value.

■ 30. ICS did not lose any business because of the disappearance of the 113 containers; no dispatch requests for those particular containers were received by Dependable or Marine. The evidence was insufficient to establish that the loss of the containers represented a loss of capital to ICS that would justify an award of prejudgment interest.

## CONCLUSIONS OF LAW

■ Under Maryland law which governs this diversity case, "To constitute a

bailment there must be an existing subject matter, a contract with reference to it which involves possession of it by the bailee, delivery, actual or constructive, and acceptance, actual or constructive." *Broadview Apartments v. Baughman,* 30 Md.App. 149, 151, 350 A.2d 707 (1976), quoting *Refining Co. v. Harvester Co.,* 173 Md. 404, 415, 196 A. 131 (1938). There can be no doubt, and Dependable concedes, that the depot agreement between ICS and Dependable created a bailment. Under the law of bailments and the terms of the contract, Dependable owed ICS a duty of reasonable care for the containers.

Dependable argues that it discharged its duty of reasonable care by leaving the containers with Marine. It claims that Marine should contribute to, or indemnify it against, any judgment against Dependable in favor of ICS, because it claims that Marine was a sub-bailee. Neither argument holds up under the evidence.

■ Dependable argues that it left the ICS containers on Marine's lot, that the ICS containers therefore received the same care as the other containers on Marine's lot, and that there was no evidence that Marine's care for the containers on the lot fell beneath standards of care in the industry. But the evidence showed that Marine did not give the ICS containers the same level of care it gave its own containers. Marine did not keep inventory cards for the ICS containers, and did not take an inventory of those containers, as it did with its own containers. Based upon the repeated requests of Marine to remove the containers, Dependable knew that Marine considered the ICS containers a nuisance and considered them the exclusive property of Dependable. From the casual inspections of the Highland Avenue site by Mr. Johnson, Dependable knew that Marine was exercising absolutely no control or dominion over the containers. Marine simply left the containers where it found them, and repeatedly asked Dependable to move them off the premises.

■ Dependable's failure to return the containers makes out a *prima facie* case of

lack of due care. *Charles J. Miller, Inc. v. McClung-Logan Equipment Co.*, 40 Md. App. 585, 392 A.2d 1153 (1978). Assuming *arguendo* that leaving the containers with Marine was sufficient to rebut the presumption of negligence, ICS proved by a preponderance of the evidence that Dependable was negligent in several specific respects. Dependable did not provide Marine with inventory cards of the ICS containers. Johnson's casual visual inspections of the shed where the ICS containers were stored were not sufficient to detect the disappearance of even a considerable number of the containers. Given the difficulties of removing the containers, any conscious theft must have resulted from someone's knowledge that Dependable was not properly keeping track of the ICS containers. If the disappearance was the result of confusion or inadvertence, the confusion was engendered by Dependable's virtual abandonment of the ICS containers in a non-visible part of the Highland Avenue site. And if the containers disappeared over a long period of time, which seems probable given the difficulties of moving and disposing of the containers, then Dependable's failure to keep an inventory of the containers prevented it from discovering and stopping the gradual disappearance of the containers.

■ It is also clear that Marine is not required to indemnify Dependable for Dependable's own negligence. Dependable did not deliver the containers to Marine, and Marine did not take possession of them, two necessary preconditions for the creation of a bailment. There was no delivery because Dependable did not turn over any inventory cards to Marine, never generated any TIRs to ICS indicating that it had renounced possession over the containers, and did not tell Marine that Marine was free to deal with ICS directly until mid-1983. Dependable dispatched other containers that it left at Highland Avenue and did not require Marine to dispatch them.

Marine never took possession of the containers because it never moved them, never took an inventory of them, never dispatched them. Marine made it clear that it considered the containers the responsibility of Dependable, and also clearly told Dependable that it wanted nothing to do with the containers and wanted the containers removed.

■ The storage payments did not change the nature of the relationship between Dependable and Marine; both parties clearly understood that the containers were the responsibility of Dependable. Marine wanted the containers off its property, and the escalating payments were part of the effort to get Dependable to move the containers. Under the circumstances the payments created a lease only, similar to the lease of a parking space which does not create an easement. *Broadview Apartments, supra.*

Marine made it clear that it allowed Dependable to leave the containers at Highland Avenue reluctantly, and nothing more. Under the mutual understanding of their relationship, Marine owed Dependable no duty to take an inventory of the ICS containers or to provide after-hours security.

Accordingly, the Court will enter judgments for plaintiff ICS and third-party defendant Marine. The Court holds that the stated depreciation value of the missing containers—$244,580—is the best measure of plaintiff's damage.