648 A.2d 1115

**JOHN T. HANDY CO., INC.**

v.

**James CARMAN, et al.**

**No. 232, Sept. Term, 1994.**

Court of Special Appeals of Maryland.

Oct. 28, 1994.

Certiorari Denied March 7, 1995.

Michael J. Jacobs (Miles & Stockbridge, on the brief), Easton, for appellant.

John R. Kaye, Columbia (Robert R. Bowie, Jr. and Bowie & Jensen, Towson, on the brief), for appellees.

Argued before FISCHER, CATHELL and DAVIS, JJ.

CATHELL, Judge.

This is a crabby case! Appellant, John T. Handy Co., Inc., appeals from a verdict rendered by a jury in the Circuit Court for Somerset County in which James Carman, Ward and Wade Walker, and Jack Howard, appellees and Crisfield crabbers,[1] were awarded $78,850 in damages. The cause of action arose out of, and damages were awarded in respect to, the alleged negligence and/or breach of contract by appellant in

---

1. Here in its generic sense. The Crisfield High School teams are also known as the Crisfield Crabbers.

failing to keep shedding shanties operating in a proper fashion causing the deaths of tens of thousands of peelers, busters and, presumably, soft crabs.

Before proceeding to appellant's questions, a rudimentary understanding of the soft shell crab process may be helpful. We will identify some of the stages and types of crabs, first noting that shedding is a vital part of the reproduction process, *i.e.*, mating occurs during the female crab's soft shell stage and males, being caring and attentive creatures, grab, restrain and enclose the females and thus protect them during the peeler, buster, and vulnerable soft shell stages.[2]

Peelers are hard crabs thinking about shedding. They are distinguished by colorations. Busters have gone further than thinking about it; they are literally "busting" at the seams. Soft crabs have "busted" out or shed their hard shells and their new shells have not yet begun to harden. Paper shells (buckrams) represent an intermediate stage, after the soft shell of the crab has begun to harden from the minerals in the water. Paper shells have little marketable value, though it is not uncommon for them to be eaten. The last stage is the return to the hard crab stage. There is a brief period during which time the soft crab must be removed from water, after the buster has completed the process of busting out, so it does not transmogrify into a paper shell and become a hard crab once again.

In order to monitor the process, female peelers are caught in open water, often enticed by hardshell male "Jimmy" crabs,[3] and transferred to floats (usually, now in shanties)

---

**2.** They have been known to continue to protect the females even after mating has been terminated—for as much as forty-eight hours—until the female's shell is sufficiently hardened to afford complete protection.

**3.** "Jimmy" crabs are utilized in the unique practice of "Jimmy" potting; generally a late May method of catching peelers using mature male crabs to attract female crabs to the pots. It has been thus described:

The virginal females who did not get their chance in the fall [to mate] evidently build up a strong mating urge over the winter and are attracted by the encaged males.... [T]he females readily enter the

where fresh salt water is continually pumped in (or, in some instances, naturally passes through floats that are anchored in waterways). This keeps the crabs alive as they pass through the various stages of the shed. During this process, the crabs (1,000 to 1,200 a float) require constant monitoring (tending) so that the soft shells may be immediately removed (fished) from the water in order to keep them in a soft state and to otherwise protect them from predation by other crabs.

Appellant presents five questions:

1. Did the Trial Court commit reversible error by instructing the Jury on the law of bailments?

2. Even if it was not erroneous for the Trial Court to have instructed the Jury on the law of bailments, was it reversible error not to also give the requested instruction that before the theory of bailment could be considered, the Jury must first find that the crabs had been delivered to John T. Handy Co., Inc., which thereafter had exclusive control of the crabs at the time of the alleged loss of crabs?

3. Did the Trial Court commit reversible error when, over objection, it admitted evidence of a compromise and settlement of a disputed claim in 1988 offered to show that

---

pot.... The two or three males may entice as many as twenty or thirty female peelers.

William W. Warner, *Beautiful Swimmers: Watermen, Crabs and the Chesapeake Bay*, 136–37 (1976). Once a female becomes sexually mature and mates it is believed that she no longer moults or sheds. It is during this last shed to sexual maturity that the female's apron changes from v-shaped to circular and mating occurs. Thereafter, females are known as "sooks." "Sooks" spawn generally the following spring or summer, and then are believed to go to sea to die.

"Jimmy" crabbing is distinguishable from "Jimmy" potting and refers to a Smith Island practice of tying a line around one of a Jimmy crab's swimming legs, returning it to the water where it grabs female peeler crabs that it has enticed. The courting crabs are then pulled in reach of a net and netted, with the Jimmy crab being returned to the water to grab other females. As Captain Kitchy noted, "I remember one Jimmy I had on the line ... he caught seven wives just as fast as he could get them.... [A]ll of a sudden he wouldn't catch any more. I couldn't blame him none, so I went on and let him rest." Warner, *supra,* at 138. While both male and female crabs moult and go through the soft shell status, males are not in moult during "Jimmy" potting and "Jimmy" crabbing.

the intention of the parties in 1991 was that John T. Handy Co., Inc. would pay such claims?

4. Did the Trial Court commit reversible error when, over objection, it admitted into evidence the 1992 agreement between John T. Handy Co., Inc. and other crabbers to show the intent of the parties in 1991, where the 1992 agreement had been materially changed from 1991 to address the problems which had arisen with the Plaintiff Crabbers in 1991?

5. Did the Trial Court commit reversible error when, over objection, it permitted the Plaintiff Crabbers to appeal to the ethnic and racial biases of the Jurors by blaming the uninvolved Japanese owners of John T. Handy Co., Inc. for the problems alleged?

We shall address these questions as necessary. First, however, we shall note certain facts pertinent to our inquiry.

### Facts

Appellant is a soft crab processor, *i.e.*, it is in the business of purchasing and processing soft crabs that it receives live (or "still") from crabbers, and then reselling the processed crabs, frozen or alive. The shedding season runs roughly from May through September. One of, if not the major, "runs" of soft shells occurs in the mid-May to early June period.

In earlier days of the industry, and to some extent even today, shedding was done by the crabbers in individual shanties or numerous floats actually situated in bay waters where the persons tending the floats would do so by way of catwalks over the water or from boats. Because of the necessity to "tend" the floats around the clock, they were luminated. It was not at all unusual to see strings of low intensity lights strung out over the water of many of the creeks, harbors, and crabbing centers of the lower shore.

Relatively recently, however, processors, such as appellant and others, began to construct "floats" that were not floated but, rather, were constructed out of the water and compart-

mentalized in shanties,[4] some containing scores of individual floats and most with a capacity of 1,000 to 1,200 crabs per float. Water is then pumped from the water source to the floats in a continual cycle to provide fresh salt water and, thus, oxygen in which the peelers and busters, are placed to complete the cycle to soft crab stage. A denial of water, or a breakdown in the pumping system, can cause massive kills, which is what allegedly occurred in the case *sub judice.* Some shanties that processors provide are rented out to crabbers who must provide their own pumps and water supply system to the leased floats. Other shanties, including the ones at issue here, are rented to the crabbers under arrangements that require the lessor, appellant here, to provide the water system to the shanties and floats. Under either type of arrangement, the processor's primary purpose is. to have a ready supply of soft crabs available for purchasing, processing, and resale. Some arrangements,[5] including those at issue here, require the crabbers to sell all of the marketable crabs shed in the shanties and floats rented from the processor to that processor. If the crabber does not do so, the arrangements require that the crabbers vacate the premises.[6]

Additionally, as part of the interaction between processors and "its" watermen,[7] the processors regularly lend start up money to the watermen for new pots, repairs, etc., at the beginning of the season. The loans and the rental payments for the shanties and floats are deducted from the sums due the

---

**4.** As we hereafter use the word shanty, it means a wire enclosed, lockable, roofed enclosure containing numerous floats in which crabs are shed.

**5.** We generally use the term "arrangement." The document at issue here, and the ones that preceded it, were documents prepared by appellant and presented to appellees, more or less, on a take it or leave it basis. There was no provision or requirement that the appellees sign the document.

**6.** "Anyone who takes soft shell crabs or peelers from the property will be asked to leave immediately."

**7.** We do not mean to imply that watermen are less than independent.

watermen for the soft shells sold to the processor. Sales culminate when the soft shells are delivered to the processor's "dock" throughout each day as they are removed from the floats. They are immediately placed in coolers to await further processing. A system of tickets has been devised to keep track of the source of the soft shells received.

In the case at bar, appellant paid the watermen once weekly, on Friday or Saturday, for soft shells delivered throughout the week. The price was set each Friday or Saturday solely by appellant for all the soft shells sold during the preceding week. The sums borrowed and rental sums due for shanty and float rental were then deducted from the amounts due according to a formula based upon previous year's catch records and other factors.

In the case *sub judice,* appellees filed suit claiming that appellant's water provision system had become inoperative, resulting in the premature death of most of the crabs in the floats. Appellee Howard offered evidence that at the time of the problem, he had between 80,000 and 96,000 crabs in his floats.[8] He was able to salvage "406 dozen crabs (4,872)." Appellee Carman had "76,800 crabs" in his floats and was able to salvage 7,346. The Walkers had between 56,000 and 72,000 crabs. They salvaged 6,744 crabs. After further allowances were made for normal mortality losses, the jury awarded damages to each appellant, apparently based upon an average price paid the watermen of $.50 per crab. Based upon the figures they presented to the jury, appellees claimed that Mr. Howard was entitled to damages in excess of $45,000; Mr. Carman was entitled to damages in excess of $32,800, and the Walkers to damages in excess of $30,000. Howard received an award of $30,000; Carman $26,500, and the Walkers $22,600.

---

**8.** Crabs apparently are deposited in individual floats by the bushel. Generally, a bushel of peelers contains 250 crabs. Five or six bushels would be deposited in each float. It was testified that from 1,000 to 1,200 crabs would be in each float at maximum capacity. Total crab figures in the case *sub judice* were apparently computed by multiplying the number of floats by the number of crabs per float.

None of the parties has appealed the amount of damages the jury awarded to the respective appellees.

At the conclusion of the evidentiary stage, the trial judge presented copies of the special verdict sheet he proposed to furnish the jury to each party. Appellant's attorney responded, "It looks fine just the way it is."

The parties did not designate or include that verdict sheet in the extract. The record includes at least two special verdict sheets. However, the completed verdict sheet contained in the record, which we presume was the one presented to the jury, provides as follows:

### SPECIAL VERDICT SHEET

1. Do you find for the Plaintiff, James Carman?

 Yes x No _

2. If you find for the Plaintiff, James Carman, what if any, damages do you award?

 $26,250.00

3. Do you find for the Plaintiffs, Wade Walker and Ward Walker?

 Yes x No _

4. If you find for the Plaintiffs, Wade Walker and Ward Walker, what if any, damages do you award?

 $22,600.00

5. Do you find for the Plaintiff, Jack Howard?

 Yes x No _

6. If you find for the Plaintiff, Jack Howard, what if any, damages do you award?

 $30,000.00

From the verdict sheet, there is no way to determine whether the jury's verdicts were based on bailment principles, negligence principles, or contract, *i.e.,* lessor/lessee breach of contract principles.

Prior to submitting the case to the jury, the trial judge gave his charge. His instructions included an instruction on bailment that appellant asserts was in error:

Bailment is the delivery and acceptance or obtaining of possession of property for a particular purpose without transfer of ownership. The bailor is the party who delivers the property. The bailee is the party who receives or has possession of the property and is required to return the property when the purpose for the delivery or obtaining possession is accomplished.

A bailment for hire is one from which both the bailor and the bailee benefit. To recover damages, the bailor must prove that a bailment for hire existed and that the bailee did not return the property in the condition it was when received, ordinary wear and tear excepted. Even though the bailee shows that the loss resulted from an alleged accident or action beyond his or her control, the bailor may, nevertheless, recover if the alleged accident or action beyond the bailee's control could have been avoided by the bailee's use of reasonable care. The bailor has the burden of proving that the loss could have been avoided had the bailee exercised reasonable care over the property.

At the conclusion of the trial court's charge, appellant's counsel approached the bench and stated:

Your Honor, as you know, my exceptions are to all of the instructions with regard to bailment. My basic position is this. The concept of bailment is one which arises in the law to permit parties who have turned over the exclusive control of property to another party, called a bailee, to recover by shifting the burden or the burden of going forward to the party, the bailee, to prove that they were not negligent if the property was damaged by the time the bailor got the property back.

In order to accomplish that, I believe all the case law on bailment is confusing in some respects. But I believe it is crystal clear on this point, as illustrated by Broadview Apartments, that where the control of the property that is

subject to the bailment is not subject to—has not been delivered to the exclusive control of the bailee, then it cannot be a bailment.

And so, for that reason, I except to all of the instructions that bring bailment into issue. I think it's simply going to confuse the jury on an issue which is not in this case, because the evidence is clear that the crabbers put the crabs in, the crabbers tended them while they were in the floats, the crabbers took them out, and the only time that Handy got the exclusive control of that property was when it was sold to them as a soft crab. The only reason that Handy had any access at all to their premises was solely for maintenance purposes.

Even, I would go one step further, however, with the exception. Even with respect to the bailment instructions given, they do not include an instruction which I had included within my earlier summation, where I had included bailment before all the evidence was in, which makes it clear that the jury has to decide whether or not the property was subject to the control of the bailee, in this case Handy, since the jury is not even aware that that is an issue they have to determine. It suggests to them that—it could suggest to them, certainly, that there is a bailment here where there is, at the very minimum, a factual dispute and, of course, I don't believe it's even a factual dispute.

Those are my exceptions, Your Honor.

**Question 1. Did the Trial Court commit reversible error by instructing the Jury on the law of bailments?**

 We have exhaustively reviewed the evidence presented at trial and can come to no other conclusion but that no bailment of the type suggested by the appellees possibly existed under the facts of this case.[9] It was, thus, error for the trial court to instruct the jury on bailment. It was prejudicial error in that it, in and of itself, created for appel-

---

9. We recognize, of course, that there are other types of bailment situations. *See* 8 C.J.S. *Bailments,* § 41 (1980) and 8 Am.Jur.2d *Bailments* § 156 (1980).

lees a *prima facie* case and shifted the initial burden to appellant to establish a lack of its negligence. Moreover, because of the special verdict sheet used and the bailment instruction given, we are unable to determine whether the jury rendered its verdict because the crabs somehow were not returned in satisfactory condition to appellees (bailment) or because it found appellant negligent, or because it found that appellant had breached its duties under the lease. If based solely upon a failure to return the crabs, the verdict would not be supported by the evidence adduced. We shall, however, remand the case for retrial because there existed sufficient evidence for the submission to the jury of the causes of action in breach of contract, and, perhaps, even in negligence, as the damages claimed might be, under *A.J. Decoster Co. v. Westinghouse Electric Corp.,* 333 Md. 245, 634 A.2d 1330 (1994), considered damages to the property of appellant.[10]

■ We shall first address the general law of bailments. The early types of bailments were divided into five classes: (1) depositum, (2) mandatum, (3) commodatum, (4) pignori acceptum, or vadium, and (5) locatum.

*Depositum.*—Depositum, or a deposit, is a naked bailment, without reward, of goods to be kept for the bailor, by one usually called a depositary. Custody, as opposed to service, is said to be the chief purpose thereof. But there is a large class of deposits in which there is no actual delivery to keep and no actual agreement to accept the goods or to keep or take care of them, and the contract of the depositary is implied from the nature of the transaction or occurrence by which the property comes into the hands of one not the owner, and from the principles of equity and justice that ought to govern the conduct of men toward each other.

*Mandatum.*—Mandatum, a mandate or commission, may be defined as a bailment of goods without recompense, where the mandatary, or person to whom the property is

---

**10.** In *some* respects, *Decoster* is similar to the facts of this case if chickens are substituted for crabs and power loss for pump loss.

delivered, undertakes to do some act with respect to the thing bailed, as simply to carry it. It is a bailment of something for mere gratuitous service on it by the bailee.

*Commodatum.*—A commodatum consists in the gratuitous lending of personal property to be used by the bailee and returned in specie.

*Pignori Acceptum or Pignus.*—Pignori acceptum, or pignus, sometimes called vadium, and, in English, a pawn or a pledge, occurs when goods or chattels are delivered to another in pledge, to be security to him for money borrowed or another engagement entered into with him by the bailor.

*Locatum.*—Locatum, sometimes designated as locatio et conductio, or a hiring, arises when goods are left with the bailee for some use or service by him, and is always for some reward. This species of bailment has been subdivided as follows: (1) locatio rei, or the hire of a thing, whereby the hirer gains its temporary use; (2) locatio operis faciendi, or the hiring of work or labor on a thing; (3) locatio custodiae, or the hiring of care and pains, or services, to be performed or bestowed on the thing delivered; and (4) locatio operis, mercium vehendarum, or the hiring of the carriage of goods, when they are bailed, either to a public carrier or to a private person for the purpose of being carried from place to place.

8 Am.Jur.2d *Bailments* § 16 (1980) (footnotes omitted).

■ Modern usage, however, divides bailments into three types:

(1) for the sole benefit of the bailor; (2) for the sole benefit of the bailee; and (3) for the mutual benefit of both. This modern classification is comprehensive and includes every kind of bailment. Under it the old Roman divisions group themselves readily. Thus, in the first class-bailments for the bailor's benefit-come depositum and mandatum. Commodatum is embraced by the second class, as it is a bailment for the bailee's sole benefit. And the third class, bailments for the mutual benefit of both parties, comprises

locatum, with its subdivisions, and pignori acceptum or vadium.

8 Am.Jur.2d *Bailments* § 17 (1980).

In the case *sub judice,* a bailment, *if any exists,* would come under the third modern classification, *i.e.,* a bailment for the mutual benefit of both. Thus, it is our function to determine whether, based upon the facts of this case, a bailment existed in the first instance.

The Court of Appeals discussed one of the definitions of a bailment in *General Refining Co. v. International Harvester Co.,* 173 Md. 404, 414–15, 196 A. 131 (1938):

A bailment is said, in *Dobie on Bailment and Carriers,* to be: "The relation created *through the transfer of the possession* of goods or chattels, by a person called the bailor to a person called the bailee, without a transfer of ownership, for the accomplishment of a certain purpose, whereupon the goods or chattels are to be dealt with according to the instructions of the bailor." Other definitions cited by Dobie are these: "Bailment is defined by Sir William Jones (*Jones, Bailments,* 1) *as being a delivery of goods* in trust, on a contract, express or implied, that the trust shall be duly executed, *and the goods redelivered* as soon as the time or use for which they were bailed shall have elapsed or been performed. According to Judge Story (*Story, Bailments,* ch. 1, sec. 2) a *bailment is 'a delivery of a thing* in trust, for some special object or purpose, and upon a contract, express or implied, to conform to the object or purpose of the trust.' In *Kent's Commentaries* (2 Kent, Comm. [4th Ed.] sec. 40, p. 558) a bailment is said to be 'a *delivery of goods on trust,* upon a contract, express or implied, that the trust shall be duly executed, *and the goods restored by the bailee,* as soon as the purpose of the bailment shall be answered.' "

. . . .

To constitute a bailment there must be an existing subject-matter, a contract with reference to it *which involves possession of it by the bailee, delivery,* actual or construc-

tive, and acceptance, actual or constructive. 6 *Amer.Juris.* 190 *et seq.* [Emphasis added.]

 The effect of a mutual bailment, if one exists, is that upon a mere showing that the item bailed has not been returned, then

> in such case, [where] a demand and an unexplained refusal to [re]deliver are proven, a *prima facie* case of negligence is made out; yet, when the loss ... is ... occasioned by a cause which would excuse the bailee, ... then the defense is complete, unless the bailor follows by showing that the bailee, by the exercise of ordinary care and diligence might have avoided the loss or injury.

*Fox Chevrolet Sales, Inc. v. Middleton,* 203 Md. 158, 161, 99 A.2d 731 (1953). *See also Charles J. Miller, Inc. v. McClung– Logan Equip. Co.,* 40 Md.App. 585, 392 A.2d 1153 (1978), where the late Judge Liss, for the Court, discussed the historical origins of the law of bailments and condensed the body of a law to its simplest components.

The law of bailments is ancient—extending back to Biblical times and before. The Biblical law of bailments, as so many other facets of the law, filtered through the ecclesiastical courts into the common law and was adopted here in Maryland. It is amazing how little change has occurred in the law of bailments over the intervening centuries since the time of Moses. In a long series of cases factually similar to the case at bar, Maryland has stated the controlling principles of bailment law: when the subject matter of a mutual bailment for hire *is delivered by the bailor to the bailee, it must be returned by* the bailee in substantially the same condition ordinary wear and tear excepted. When the bailed chattel is *either not returned or returned in a damaged condition* without legal excuse, a prima facie case of lack of due care or negligence is made out. It is then the duty of the bailee to go forward with proof that the loss or injury was occasioned by a cause which excuses the bailee, thereby providing a complete defense as the bailee is not an insurer. The bailor is then, by reason of his burden of

proof, required to overcome this defense by establishing by a preponderance of the evidence that the bailee failed to use ordinary care and diligence to safeguard the bailor's property, and that failure to perform his duty caused the loss to the bailor.

*Id.* at 588, 392 A.2d 1153 (emphasis added, footnote omitted). *See also Stehle Equip. Co. v. Alpha Constr. & Dev. Co.,* 247 Md. 210, 213, 230 A.2d 654 (1967) (*"[o]nce appellant proved the delivery,* the bailment for hire, *and the unexplained failure to return* . . . a prima facie case of negligence was made out") (emphasis added); *Trans–System Service, Inc. v. Keener,* 249 Md. 369, 372, 239 A.2d 897 (1968); *Moore v. State,* 47 Md. 467 (1878).

*Blondell v. Consolidated Gas Co.,* 89 Md. 732, 43 A. 817 (1899), involved the placement of a gas meter belonging to the company upon the property of others and the rights thereafter of Blondell to place governors on those meters on behalf of property owners. The company argued: "[T]he meter and its connections are its property . . . the law gives to it the sole control and management . . . and that . . . [no one] has the right to disturb or interfere with the meter . . . without [its] consent. . . ." *Id.* at 744, 43 A. 817. Blondell argued that the placement of the meter constituted a bailment with the property owners and that, as bailees, they had the right to "use them for any reasonable purpose." The Court responded: "It is apparent . . . that the apparatus . . . is not *delivered* to the consumer for any purpose whatever. It is true, it is "placed" . . . *for the purpose of measuring the gas consumed. . . .* In order to effect a bailment *there must be a delivery* either real or constructive. Here there is neither." *Id.* at 746, 43 A. 817 (some emphasis added).

In the landlord tenant case of *Broadview Apts. Co. v. Baughman,* 30 Md.App. 149, 350 A.2d 707 (1976), we reversed a trial court's finding of bailment in respect to the leasing of a parking space in a garage. At trial, Broadview rested its case without putting on any evidence, asserting that the plaintiff failed to establish that the car in issue had been delivered to it, and, thus, it was not the bailee of the car. The trial court

did not agree and held Broadview to be the bailee. We noted the importance of the bailment issue at 152–54, 350 A.2d 707:

[I]t is readily apparent that the answer to the threshold question of whether a bailment exists will have not only a procedural but often times a substantive impact on the outcome of the case. If no bailment is shown, and the owner of the property is a mere licensee or lessee of the storage space, then in order to recover against the defendant garage owner the plaintiff would have to prove specific acts of negligence on the part of the defendant proximately causing loss or injury of plaintiff's property. Absent a bailor-bailee relationship, the plaintiff would not have the benefit of any inference or presumption of negligence that arises from a *mere showing of non-return of* his property if that relationship existed.

. . . .

In the instant case we think the evidence is legally insufficient to establish that a bailor-bailee relationship existed. Appellee merely rented a parking space monthly; he parked his own car, locked the car and took the keys with him. There was no testimony that Broadview had a set of keys for the car or had any right or authority to move or exercise any control over the car. The parking garage was laid out in such a manner that it was possible for appellee to park his car without any attendant even being aware of his presence in the garage. Appellee entered into the monthly lease arrangement with full knowledge of how the garage operated. He was not required to check his car in or out, and there was no evidence whatsoever that control of the car was ever turned over to the operators of the garage, or that they ever accepted delivery or control. Nor was there any evidence that Broadview expressly contracted or asserted that the car would be safe from theft while in the garage. [Emphasis added, footnotes omitted.]

Similarly, in the case at bar, according to the letter agreement and pursuant to the evidence adduced at trial, appellees merely rented a shanty and its floats on a seasonal basis, the peelers were placed in the floats by the appellees and were

tended by the appellees, and the soft crabs and dead crabs were "fished" out by the appellees. During that entire process, the crabs, in whatever stage, were in the possession of appellees. Appellant had no right to use the floats, once rented to appellees, for any purpose other than maintenance without first contacting the appellees. Nor did appellant have any right to exercise control at any stage of the tending process. Moreover, the appellees did not check in with appellant prior to entering the shanties, but had their own keys, and came and went as they chose without appellant necessarily having any knowledge that they were there. Appellees had full knowledge of the letter agreement or arrangement. More importantly, there was absolutely no evidence of any delivery of any crabs until the soft crabs had been removed from the floats and shanties and delivered to appellant at another location—"the dock." Moreover, under the arrangement here, of which appellees had full knowledge, the soft crabs, once delivered to appellant, were not intended to be returned to appellees. There was, thus, never any delivery to, or possession by, appellant prior to the transfer of the soft shells to appellant's dock. Even then, there was never any intention by either party that the soft shells would be returned to appellees. At that point, appellant got the soft shells and appellees got money—that is a buy-sell arrangement.

The letter document clearly supports this as a non-bailment arrangement. It provides:

HANDY

SOFT SHELL

CRABS

April 29, 1991

Another soft crab season is almost here. There are no major changes from the previous season and the purpose of this letter is just to remind you of some of the important things that will help everyone have a good season.

Many have suggested that they would like to receive their checks earlier on Fridays. Therefore, the new cutoff time is 4:00 p.m. on Thursday instead of Noon on Friday.

Your checks will be ready by 5:00 p.m. on Friday. The only exception to this may be during the May run and even at that time, we will attempt to have the checks ready by 5:00 p.m.

Our system for giving out live crab boxes will be a little different this year so please be sure to read the box section on the enclosed information.

Your crabs are important to us and we expect the person at the dock,[11] whether day or night, to take care of your crabs immediately. If this does not happen for some reason, please let me know at once.

We hope you have a good season!

Sincerely yours,

Carol A. Haltaman

### THINGS TO REMEMBER FOR 1991
### SOFT CRAB SEASON

We will use the same three cards again this year. Please include on each card your name, number and the total number of crabs.

Green card This is your two-part master card for all boxes and trays brought each delivery.[12] Please stamp both sides at the time clock, keep one side for your records and put the other in the "mail slot".

Buff card The buff card is for each box. Please staple the buff cards to the outside of the box.

---

11. A Handy employee whose function it was to receive the soft crabs at Handy's "dock" after they had been removed from the shanties and transported to the "dock" by appellees.

12. Delivery as used here was the delivery to "the dock" of the soft shells, not appellees' delivery of their peelers to their leased floats and shanties.

<u>Rust card</u> The rust card is for stills. Please put your stills [13] in separate boxes during the "May run" and on Saturdays and Sundays. Please staple the rust cards to the outside of the box.

<u>Cutoff time</u> The cutoff time this year will be 4:00 p.m. on Thursday.

<u>Checks</u> Your checks will be ready by 5:00 p.m. on Friday. The only exception to this would be during the May run, however, we will still do our best to make this deadline.

<u>Undersized crabs</u> Let's all avoid any fines and do not send us those small crabs. They are illegal and we cannot pay for them. Throw them back and later you'll catch a Medium or Hotel and we can pay for these.

<u>Bucks/rots/bodies</u> Keep those bucks/rots and bodies. We cannot buy these crabs. Only crabs that have at least 3 legs and one of these legs must be on each side are acceptable. Anything less is a body.

<u>Rent</u> We are pleased to report that while everything else has gone up, we are keeping our rents for the shanties the same. The rental rates including electricity are:

8–float shanty $550/season

12–float shanty 800/season

16–float shanty 950/season

28–float shanty 1,625/season

32–float shanty 1,700/season

64–float shanty 2,600/season

---

13. A "still" is a crab that is believed to have died as it shed its hard shell, but was immediately removed from the water and is considered marketable even though, because it is no longer alive, it is "still," *i.e.,* not moving. Older, thus normally larger, crabs have more difficulty molting (shedding) and thus experience a higher mortality rate during the shed. "Rots" are soft shells that die when they shed and are not immediately removed from the water and begin to rot. "Bucks" are live crabs that are almost paper shells (buckrams) because they were not "fished" out of the water soon enough. "Stills" are handled separately. Bucks, rots, and "bodies" (crabs minus most of their legs and claws) are not considered markctable.

Rents are deducted from your checks at the beginning of the season when your checks are the largest. *You* will be responsible for the maintenance on *your* shanty which includes items such as light bulbs (use 75 watt or less). If you should vacate *your* shanty, we may want to move someone else into it because we want the shanties used all season. We will notify you first before doing this.

Shanties Building and maintaining the shanties is not cheap. We have set them up for *your* best use. Please do not make any material changes to the shanties (do not change pipes, cut pipes, etc.). If for some reason you feel something should be changed, you must get our approval first.

Neatness Please keep *your* shanty neat and clean. This means sheds [14] should be put in the dumpsters daily. There are plenty of dumpsters on the property for this purpose.

We have had problems in the past with dirty shanties and we cannot permit this. If *your* shanty needs to be cleaned, we will first leave a note on your door. If it is not cleaned at once, we will clean it for you and deduct a $50.00 cleaning fee each time we must clean it.

Crabs overboard Do not throw *your* sheds and dead crabs overboard. This is bad for everyone and there was a great deal of this taking place last season. Please use the dumpsters.

Bringing crabs to Handy Please feel free to bring *your* crabs to us often. We are open 24 hours per day and there is someone here [15] to receive *your* crabs. Keeping crabs in the refrigerators is not a good idea because it is too cold on the crabs.

*Your* crabs are important to us and they are far more important to us in good lively condition. Bring them often and let us know if you ever run into any problems with any

---

14. The shed hard shell discarded by the crab in the shedding process.

15. "Here" refers to the receiving "dock."

of the night personnel promptly taking good care of *your* crabs and putting them immediately in our cooler.

Ice You are welcome to get ice to take out on your boats when you go out crabbing. We will keep the ice in our cooler in large white tubs. Please get it from the cooler and not from the ice machine in our plant.

Security We provide a security guard to be available to receive *your* crabs and to check all shanties to be sure all pumps are running, electricity is on, etc.

We cannot be responsible for *your* crabs, but we will do all we can to insure that they are safe. We must have your home phone number and a backup number if available so we can reach you should an emergency occur. In the event of storms, power outages, etc., you should get to *your* shanty immediately in order to insure that no damage occurs to *your* crabs.

We cannot be responsible for theft of *your* crabs. Should you feel that *your* shanty is not sufficiently secure, please feel free to put a chain on the door. We must have a key to any locks on *your* shanty in the event of an emergency. Please check with us before installing any locks which we cannot open.

Crabs We have invested a great deal of money *to provide a facility for you to shed your crabs and sell to Handy.* Anyone who takes soft shell crabs or peelers from the property will be asked to leave immediately.

Boxes For some reason our live crab boxes seem to "walk" off our property. We have made it very easy for anyone in Crisfield to come on our property and help themselves to our boxes. These boxes are not cheap.

In order to better control this, we must keep our boxes locked at all times this season. We do not want to cause you any problems because of a situation that you have not created. Therefore, we will supply you with a certain number of boxes free at the beginning of each season (the number of boxes will be determined by the number of crabs you brought us last year). Every time you bring us crabs,

we will give you exactly the same number of boxes you bring us.

This should work all season and you should have no problems. If for some reason, you need more boxes than we have given you, we will have to charge for them. The charge will be $4.50 per box. This is our cost. [Emphasis added.]

The evidence is uncontradicted that no delivery of soft crabs (or any crabs) to appellant was ever intended prior to the time appellees *delivered and sold* the soft crabs to appellant and, when doing so, delivered them to appellant at "the dock" after the shedding process was completed and the soft crabs were removed from the shanties. Until that time, appellant did not possess any of the soft shells or exert any control over the shedding process. It is equally clear that, once the soft crabs were sold and delivered to appellant, they were not intended to be returned to appellees. The mere existence of a leasing arrangement whereby crabbers lease shanties in which they shed *their* crabs and ultimately remove them for later sale to a processor, after which there is no intention that the crabs ever be returned to the watermen, is not changed to a bailment because the processor is the entity that leased the shanty to the crabber. While such an arrangement may well create relationships giving rise to other contractual and/or tortious causes of action, it does not create a bailment.

Neither the letter nor the other evidence presented at trial was sufficient to present the issue of bailment to the jury. We hold in the case *sub judice,* as we did in *Broadview,* that

there is insufficient evidence to warrant a finding of a bailor-bailee relationship between the parties. The trial court was wrong in finding there was such a relationship. There being no bailment, the burden was upon the plaintiff below (appellee here) to produce sufficient evidence of specific acts of negligence on the part of [Handy] or its employees (unaided by any inference of negligence from the fact that the ... [crabs died] ) from which the trier of fact could predicate a judgment in [their] favor.

*Id.* at 155, 350 A.2d 707. *See also Commodities Reserve Corp. v. Belt's Wharf Warehouses, Inc.,* 310 Md. 365, 529 A.2d 822 (1987), "Sufficient proof of delivery ... depends upon the circumstances.... To obtain the presumption, the *plaintiff's* initial burden was to produce evidence of delivery...." *Id.* at 371, 529 A.2d 822. In the instant case, there was no delivery as delivery is defined in "bailment" law.

As there was evidence that the jury might have considered in respect to specific acts [16] of negligence, we shall remand for a new trial. In light of the reversal and remand, and the matters explained herein, we do not need to address the remaining issues.

JUDGMENT REVERSED; CASE REMANDED FOR NEW TRIAL; COSTS TO BE PAID BY APPELLEES.

---

**16.** We do not mention all of it specifically. Suffice it to say that there was evidence that the piping system had not been routinely maintained and cleaned to avoid clogging, that screens had not been kept in place, that there was insufficient backup pumping available, etc.